**SPORTIQUE MOTORS, LTD., Plaintiff(s),**

v.

**JAGUAR CARS, INC. and Porsche Cars North America, Inc., Defendant(s).**

**No. 00–CV–2037(TCP).**

United States District Court, E.D. New York.

March 20, 2002.

John S. Ciulla, Bellavia & Kassel, P.C., Mineola, NY, for Plaintiff.

Carl J. Chiappa, Jason Paul Isralowitz, Christine A. Button, Kirkpatrick & Lockhart, L.L.P., New York City, Daniel L. Goldberg, Diane C. Hertz, James C. McGrath, Bingham, Dana & Gould, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Before this Court are motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure by Defendant Jaguar Cars, Inc. ("Jaguar") and Plaintiff Sportique Motors, Ltd. ("Sportique").

From January 1989 to May 1999, Sportique was a franchised motor vehicle dealer for Jaguar. Pursuant to the franchise relationship, Sportique performed warranty service for Jaguar's customers and Jaguar reimbursed Sportique for the same. In May 1999, upon Sportique's sale of its assets to a third party, Sportique and Jaguar terminated their relationship and executed a mutual release, as the 1989 dealer agreement so required. In this action, commenced in 2000, Sportique contends that Jaguar's warranty reimbursements from 1996 to 1999 (the "Relevant Period") [1] were deficient and in violation of Section 465 of the Vehicle and Traffic Law ("Section 465") [2]. Jaguar contends that Sportique is barred from bringing this action because the parties signed a mutual release in 1999. In reply, Sportique contends that the release is invalid because it violates Section 463(2)(1) of the Vehicle and Traffic Law ("Section 463(2)(1)") [3].

For the reasons discussed herein, this Court has concluded that, in 1999, Sportique signed a valid and binding release with Jaguar and is therefore barred from

---

1. There is debate as to what constitutes the Relevant Period and what statute of limitations governs. This Court need not, and therefore declines to, decide this issue in the instant motion. For the purpose of this Memorandum and Order only, the Relevant Period will be January 1, 1996 to May 3, 1999 but that by no means indicates that this Court made a determination on the appropriate statute of limitations and/or Relevant Period.

2. N.Y.VEH. & TRAF.LAW § 465 (McKinney 1996).

3. N.Y.VEH. & TRAF.LAW § 463(2)(1) (McKinney 1996).

bringing the instant lawsuit.[4]

### VEHICLE AND TRAFFIC LAW

Section 465 reads, in pertinent part:

Every franchisor shall properly fulfill any warranty agreement and/or franchisor's service contract and shall compensate each of its franchised motor vehicle dealers for warranty parts and labor in amounts which reflect fair and reasonable compensation for such work. . . . [F]air and reasonable compensation shall not be less than the price and rate charged by the franchised motor vehicle dealers in the community or marketing area for like services to non-warranty and/or non-service contract customers, provided such price and rate are reasonable.

N.Y.Veh. & Traf.Law § 465(1) (McKinney 1996).

Section 463(2)(1) provides that it is unlawful for any franchisor:

To require a franchised motor vehicle dealer to assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed under this article, provided that this paragraph shall not be construed to prevent a franchised motor vehicle dealer from entering into a valid release or settlement agreement with a franchisor.

N.Y.Veh. & Traf.Law § 463(2)(1) (McKinney 1996).

### BACKGROUND

### I. Dealer Agreement of January 1, 1989

Pursuant to a Dealer Agreement dated January 1, 1989 (the "Dealer Agreement"), Sportique was a non-exclusive authorized dealer engaged in the business of selling and servicing Jaguar automobiles.

Eliot Brown, President and owner of Sportique, executed the Dealer Agreement for Sportique. At some point, Eliot Brown's son, Michael Brown, became a ten percent (10%) owner of Sportique. (Dep. of E. Brown at 8.)

### a. Warranty Provision

Pursuant to the Dealer Agreement, Sportique provided parts and labor to customers whose vehicles were repaired under warranty by Jaguar. (Pl.'s 56.1 Counter–Stmt. ¶ 27.) Sportique would then submit warranty claims to Jaguar to be compensated. (Pl.'s 56.1 Counter–Stmt. ¶¶ 30–45.)

### b. Mutual Release and Termination Agreement Provision

Section 17.4 of the Dealer Agreement provided, in pertinent part, that:

Upon termination of this Agreement by either party, upon its expiration without renewal, or upon the Company's approval of any purchaser(s) of Dealer or of all or substantially all of the assets used in Dealer's Jaguar Operations . . . the Company and Dealer shall execute and deliver to each other the form of Mutual Release and Termination Agreement then in use by the Company. Said Mutual Release and Termination Agreement (i) shall unconditionally terminate the Dealer Agreement then in force between the Company and Dealer and (ii) shall provide for the mutual release by each of the parties hereto of any and all claims either may have against the other, excepting only such claims as are then known to and pending between the Company and Dealer and which are expressly set forth and specified in said

---

**4.** Given that the finding of a valid release bars the bringing of this lawsuit, this Memorandum and Order neither discusses nor rules upon the various legal arguments asserted in the parties' respective summary judgment motion papers.

Mutual Release and Termination Agreement.

(Dealer Agreement ¶ 17.4.)

Requiring selling dealers to sign the Mutual Release and Termination Agreement avoids there being two Jaguar dealer agreements in effect and contention as to who owns the particular Jaguar franchise. (Dep. of Maas at 36.)

## II. Jaguar's Procedures For A Dealer's Submission of Warranty Claims

### a. Reimbursement Procedure

In order to be reimbursed for parts used in a warranty repair, Sportique and other Jaguar franchised dealers submit a claim to Jaguar. (Pl.'s 56.1 Counter–Stmt. ¶¶ 30, 33.) Jaguar maintained a warranty parts reimbursement policy (the "Reimbursement Policy"), which set forth the various rates and procedures. (Pl.'s 56.1 Counter–Stmt. ¶ 31.)

### b. Computer Overrides

If, when submitting warranty claims through Jaguar's computerized system, a dealer inputs prices of parts which deviate from the Reimbursement Policy, the computer system overrides the price and re-prices it in accordance with Jaguar's Reimbursement Policy. (Pl.'s 56.1 Stmt. ¶ 12; Def.'s 56.1 Counter–Stmt. ¶ 12.) Jaguar notes that it would, after re-pricing the part, provide a statement to the dealer with the difference between the requested price and the price actually paid. (Def.'s 56.1 Counter–Stmt. ¶ 12.)

## III. Alleged Section 465 Violations

Both parties provided evidence and legal arguments with respect to Jaguar's alleged Section 465 violations. Given that this Court has determined that the mutual release signed in 1999 was valid, this Court need not, and therefore declines to, decide whether or not Jaguar did in fact violate Section 465 or whether either party established issues of material fact regarding the same.

## IV. Sportique's Knowledge of Section 465 And Jaguar's Alleged Violations

Eliot Brown (Sportique) became aware of Section 465 in or about 1992 and at that time concluded that Jaguar was in violation thereof. (Def.'s 56.1 Stmt. ¶¶ 10–11; Pl.'s 56.1 Counter–Stmt. ¶¶ 10–11.)

Jaguar contends that, during the Relevant Period, it did not receive any objection or other notification from Sportique regarding the level of warranty reimbursement paid. (Def.'s 56.1 Stmt. ¶¶ 13–14.) In contrast, Sportique contends that it complained to Jaguar on several occasions without any response from Jaguar. (Pl.'s 56.1 Counter–Stmt. ¶¶ 10–11, 13.)

## V. Sportique's Sale To Marubeni Motor Service, Inc. And The Mutual Release and Termination Agreement of May 3, 1999

### a. Proposed Sale and Letters of November and December 1998

In a letter dated July 12, 1998, Eliot Brown (Sportique) informed Jaguar that he had received a proposal from Marubeni Motor Service, Inc. ("Marubeni") for the purchase of all of Sportique's assets. (Letter from E. Brown to Odell of 7/12/98.)

In a letter dated November 12, 1998 from Jaguar to Marubeni and copying Eliot Brown (Sportique), Jaguar approved the proposed purchase of Sportique by Marubeni, but stated that the approval was contingent upon the execution by the appropriate parties of certain documents— one being a Mutual Release and Termination Agreement (the "November 12, 1998 Letter"). (Letter from Odell to Uenoyama of 11/12/98.)

Then, on December 1, 1998, Jaguar again copied Eliot Brown (Sportique) in a letter indicating that the approval was contingent upon execution by the appropriate parties of certain documents, one of which was the Mutual Release and Termination Agreement to be executed by Eliot Brown and Michael Brown (the "December 1, 1998 Letter"). (Letter from Ruhl to Kurakake of 12/1/98.) The December 1, 1998 Letter stated that the required documents were attached thereto.

### b. Asset Purchase Agreement

Sportique and Marubeni executed an Asset Purchase Agreement dated as of April 9, 1999 (the "Asset Purchase Agreement").

Sportique contends that Marubeni and Sportique intended that the transferred assets did not include any claims by Sportique against Jaguar, including those claims for warranty parts reimbursement.[5] (Pl.'s 56.1 Counter–Stmt. ¶ 9.) In contrast, Jaguar contends that any claims Sportique may have had as against Jaguar were transferred to Marubeni and thus Sportique lacks standing to raise such claims.[6] (Def.'s Mem.Supp.Summ.J. at 13.)

### c. The May 3, 1999 Closing

Sportique closed on the sale of its assets with Marubeni on May 3, 1999 (the "May 3, 1999 Closing"). (Pl.'s 56.1 Counter–Stmt. ¶ 48.) Michael Brown, along with counsel, represented Sportique at the May 3, 1999 Closing. (Dep. of M. Brown at 124–126.) There was no Jaguar representative present. (Dep. of M. Brown at 126.)

### d. The Release

At the May 3, 1999 Closing, Michael Brown was asked to sign Jaguar's Mutual Release and Termination Agreement (the "Release"). (Dep. of M. Brown at 127–131.) Michael Brown's counsel advised him not to sign the Release. (Dep. of M. Brown at 128.) Michael Brown spoke briefly with Lee Maas of Jaguar on the telephone and informed him that he would not sign the Release. (Dep. of M. Brown at 132–134.) In response, Lee Maas informed Michael Brown that execution of the Release was required to complete the sale with Marubeni. (Dep. of M. Brown at 133–134.) This conversation between Michael Brown and Lee Maas lasted only "a couple of minutes." (Dep. of M. Brown at 134.)

Sportique's attorney drafted a protest letter, dated May 3, 1999, from Michael D. Brown (Sportique) to Lee Maas (Jaguar) (the "Protest Letter"). (Dep. of M. Brown at 139–140.) In the Protest Letter, Sportique stated that it executed the Release under protest and took the position that, pursuant to Section 463(2)(1), it was "unlawful for a motor vehicle manufacturer to require any franchise motor vehicle dealer to assent to a release, assignment, novation, waiver or estoppel as a condition of the manufacturer's consent to transfer a dealership's assets." (Letter from M. Brown to Maas of 5/3/99.)

Michael Brown then executed the Release. (Dep. of M. Brown at 140.) Michael Brown stated that he did so with the belief that the Release was unenforceable. (Dep. of M. Brown at 154.)

The Release stated, in pertinent part:

---

5. Marubeni's Assistant Secretary/General Counsel wrote a letter to this effect. *See* Letter from Reiben to "Whom It May Concern" of 6/26/01.

6. This Court need not, and therefore declines to, consider and decide Jaguar's argument that Sportique lacks standing to bring these claims against Jaguar.

For good, valuable and sufficient consideration, the parties hereto do hereby mutually and unconditionally (i) terminate the Dealer Agreement, receipt whereof is hereby acknowledged, between Jaguar and Sportique Motors Ltd. as of the date hereof; (ii) relinquish any and all rights the parties hereto may have had under said Dealer Agreement, except for such rights relating to accounts for (a) warranty and incentive claims or charge-backs, (b) parts returns or parts charges, (c) holdbacks or (d) miscellaneous adjustments normally carried on the parts account; (iii) release and discharge each other ... from any and all claims, demands, suits, and actions of every kind that each now has or may have against the other arising out of or in any way relating to the past or present course of business dealings between the parties, including, but not limited to, any claims under ... New York ... laws. Any and all claims for warranty or policy work performed prior to the termination date noted herein must be submitted by the dealer to Jaguar within 30 days following the termination date. Jaguar will not be responsible for reimbursement of warranty or policy claims submitted more than 30 days following the date of this Agreement.

(Release of 5/3/99 at 1–2.)

Sportique contends that it did not receive a copy of the proposed Release with either the November 12, 1998 Letter or December 1, 1998 Letter and did not receive a copy of the same until the May 3, 1999 Closing. (Pl.'s 56.1 Counter–Stmt. ¶¶ 6–7.)

On May 4, 1999, Lee Maas (Jaguar) responded to Sportique's Protest Letter and referred Sportique to Section 17.4 of the Dealer Agreement and stated that the draft Release was sent to Sportique with the December 1, 1998 Letter. (Letter from Maas to Brown of 5/4/99.)

## VI. The Complaint

Sportique filed a Complaint in this Court on April 7, 2000, alleging that Jaguar failed to compensate Sportique as required by Section 465.

## VII. Summary Judgment Motions

Both Jaguar and Sportique moved this Court for summary judgment. This Court heard oral argument on January 25, 2002.

## DISCUSSION

At issue here is whether the Release is valid or, as Sportique contends, in violation of Section 463(2)(1), which makes it unlawful for any franchisor:

To require a franchised motor vehicle dealer to assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed under this article, provided that this paragraph shall not be construed to prevent a franchised motor vehicle dealer from entering into a valid release or settlement agreement with a franchisor.

N.Y.Veh. & Traf.Law ¶ 463(2)(1).

Sportique contends that Jaguar required it to sign the Release by threatening that failure to do so would prevent the closing of the sale with Marubeni. This, Sportique contends, renders the Release invalid, or at a minimum raises a genuine issue of fact as to whether Sportique's execution was voluntary. (Pl.'s Mem.Opp.Summ.J. at 8–9.)

Jaguar presents an interpretation of Section 463(2)(1) as an "anti-waiver" statute prohibiting franchisors from "contracting out of liability" for potential claims, in contrast to existing claims between the franchisor and franchisee. *See e.g. A.J. Temple Marble & Tile, Inc. v. Union Car-*

*bide Marble Care, Inc.,* 162 Misc.2d 941, 618 N.Y.S.2d 155 (Sup.Ct.1994) (discussing New York Franchise Sales Act, stating that Legislature's intent was to "prevent a franchisor from contracting out of the liability imposed on the franchisor under the Act by the inclusion of merger and waiver clauses"), *aff'd* 214 A.D.2d 473, 625 N.Y.S.2d 904 (1995); *aff'd as modified,* 87 N.Y.2d 574, 640 N.Y.S.2d 849, 663 N.E.2d 890 (1996); *Schmitt–Norton Ford, Inc. v. Ford Motor Co.,* 524 F.Supp. 1099, 1105 (D.Minn.1981) (stating that the release "did not prevent suit until after the cause of action arose and only after the plaintiffs signed a separate contract and received additional consideration for the contract" and "[t]hus, since the defendant gave the plaintiffs consideration and the release was not a prospective waiver of rights, the release is not invalid as a matter of state public policy under the Minnesota Franchise Act"), *aff'd* 685 F.2d 438 (8th Cir. 1982); *Reed v. Oakley,* 172 Misc.2d 659, 661 N.Y.S.2d 754, 756 (Sup.Ct.1996).

Jaguar further points to cases where courts have upheld releases that were executed in connection with the termination of a franchise, so long as the dealer was not required to execute the release and the court found sufficient consideration. *See e.g. Hyman v. Ford Motor Co.,* 142 F.Supp.2d 735, 746 (D.S.C.2001) (finding that the plaintiff was not "required" or "coerced" to sign the release and that plaintiff voluntarily entered into the dealer agreement in 1991 and "agreed to the terms of the parts return privileges"); *Rochester Ford Sales, Inc. v. Ford Motor Co.,* 2001 WL 799594, at *3 n. 1 (D.N.H. June 21, 2001) (concluding that, upon voluntary termination of the dealership agreement, the dealer freely and voluntarily executed the release in exchange for Ford's repurchase of the dealer's inventory of parts and that "Ford did not 'require' a release of liability as a condition of the dealership relationship, but bargained for a release supported by adequate consideration at the dealer's option.").[7]

In the instant case, the execution of the Release was not "required." When Jaguar and Sportique signed the January 1989 Dealer Agreement, the parties agreed that they would execute the mutual Release upon Jaguar's approval and Sportique's sale of its assets to a third party.[8] Further, there was sufficient consideration for this mutual Release executed by both Sportique and Jaguar.

Highly persuasive to this Court is the fact that the Dealer Agreement gave Sportique the option to except claims in the Release—an option upon which Sportique did not act.[9] Given that Eliot Brown

---

7. In *Rochester Ford,* plaintiff had the following options upon voluntary termination of the dealership agreement: (1) put eligible parts back to Ford in exchange for a general release of claims against Ford or (2) keep the parts and not give a release to Ford.2001 WL 799594, at *2–3. The plaintiff chose the repurchase option and signed a general release. *Id.* The Court found that Ford gave sufficient consideration for the release by agreeing to buy back eligible parts from plaintiff's stock at plaintiff's option and further found that plaintiff was not required to sign the release. *Id.*

8. "Upon termination of this Agreement by either party, upon its expiration without renewal, or upon the Company's approval of any purchaser(s) of Dealer or of all or substantially all of the assets used in Dealer's Jaguar Operations ... the Company and Dealer shall execute and deliver to each other the form of Mutual Release and Termination Agreement then in use by the Company." (Dealer Agreement § 17.4.)

9. Section 17.4 of the Dealer Agreement provided that, upon sale of assets to a third party, the Company and Dealer would execute a release which "(ii) shall provide for the mutual release by each of the parties hereto of any

(Sportique) first suspected that Jaguar was violating Section 465 back in 1992,[10] Sportique had ample opportunity to except its claim for alleged Section 465 violations from the Release and was thus not "required" to forego said claims upon signing the Release in 1999.

When Sportique first considered selling its assets to Marubeni, Sportique had notice that it would be required to execute a Release given that Section 17.4 of the Dealer Agreement provided, in no uncertain terms, as such. Then, Sportique received copies of the November 12, 1998 Letter and December 1, 1998 Letter, both of which stated that Jaguar's approval of the sale to Marubeni was contingent upon the execution of, among other documents, the Release.

At no time prior to the May 3, 1999 Closing did Sportique approach Jaguar about excepting Section 465 claims in the Release as it was entitled to do under Section 17.4 of the Dealer Agreement.[11]

Then, again at the May 3, 1999 Closing, Sportique had the opportunity to object to the Release and to ask to except the Section 465 claims. However, the record reflects that Michael Brown (Sportique) spoke to Lee Maas (Jaguar) on the telephone for just a short time and did not request any such exception. In fact, Michael Brown, who was present with counsel, signed the Release without making any changes to it, allegedly with the misguided belief that the Release was unenforceable.

For Sportique to claim that it received the Release for the first time at the May 3, 1999 Closing and that it was required to sign the same is suspect. At the very least, Sportique was aware of the Release by way of Section 17.4 of the Dealer Agreement, the November 12, 1998 Letter and the December 1, 1998 Letter. Accordingly, Sportique could have, and indeed should have, sought to except any pending claims it had against Jaguar.

As a final note, "[u]nder New York law, a release that is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced." *Pampilonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 463 (2d Cir.1998). The Release in the instant case was clear and unambiguous. In fact, Elliot Brown (Sportique) testified that he understood that the Release was meant to extinguish all claims against Jaguar and that he authorized his son, Michael Brown, to sign the Release only because his attorney assured him that the document was illegal and unenforceable. (Dep. of E. Brown at 193–94.) Eliot Brown had no reason to believe that claims for warranty parts reimbursement would be preserved by the Release, assuming the Release was enforceable. (Dep. of E. Brown at 195.) Further, Elliot and Michael Brown were businessmen, represented by counsel, advised of the need for the Release well before the execution thereof, and had the option to invoke Section 17.4 of the Dealer Agreement and except the

---

and all claims either may have against the other, excepting only such claims as are then known to and pending between the Company and Dealer and which are expressly set forth and specified in said Mutual Release and Termination Agreement." (Dealer Agreement § 17.4.)

10. *See* Def.'s 56.1 Stmt. ¶¶ 10–11; Pl.'s 56.1 Counter–Stmt. ¶¶ 10–11.

11. Sportique unpersuasively argues that this option was insignificant given that Lee Maas, in his capacity as Jaguar's Manager of Dealer Development, had never modified a release to allow for exceptions. (Pl.'s Mem. Opp.Summ.J. at 8.) The question is not whether Jaguar had ever in the past excepted claims in any release, the question is whether Sportique had the option to do so and if Sportique did, in fact, avail itself of said option.

warranty reimbursement claims from the Release.

In conclusion, this Court finds that the Release is valid and binding.

### *CONCLUSION*

Accordingly, for the foregoing reasons, Jaguar's motion should be and the same is hereby granted and Sportique's motion should be and the same is hereby denied.

SO ORDERED.