8 So.3d 277 (2008)
Edwin L. EDWARDS, individually, and ELL 12, LLC, d/b/a Huntsville Kia
v.
KIA MOTORS OF AMERICA, INC.
1061167.
Supreme Court of Alabama.
May 16, 2008.
Rehearing Denied October 24, 2008.
*278 Thomas E. Baddley, Jr., Jeffrey P. Mauro, and M. Jay Rhodes of Baddley & Mauro, LLC, Birmingham, for plaintiffs.
Fournier J. Gale III and John A. Smyth III of Maynard Cooper & Gale, P.C., Birmingham, for defendant.
Robert A. Huffaker and R. Austin Huffaker, Jr., of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for amici curiae Automobile Dealers Association of Alabama, Inc., and National Automobile Dealers Association, in support of the plaintiffs.
SEE, Justice.
This case is before us on a certified question from the United States Court of Appeals for the Eleventh Circuit. Edwin L. Edwards, individually, and ELL 12, LLC, d/b/a Huntsville Kia (hereinafter referred to collectively as "Edwards"), sued Kia Motors of America, Inc. ("KMA"), in federal court, alleging violations of the Alabama Motor Vehicle Franchise Act, § 8-20-1 et seq., Ala.Code 1975 ("the Franchise Act"). Pursuant to Rule 18, Ala. R.App. P., the federal court has certified the following question to this Court:
"[W]hether the Franchise Act permits an automobile dealer to bring a claim under the Act, despite the fact that both parties already executed a mutual release agreement in which the dealer relinquished all existing legal claims against the manufacturer in exchange for valid consideration."
We answer that question in the negative.

Facts and Procedural History
In 2002, Edwards purchased a struggling Kia dealership in Huntsville, with the understanding that KMA would later award Edwards a dealership franchise in Opelika and find a buyer for the Huntsville dealership. However, over the next two years, contractual disputes developed between Edwards and KMA regarding inventory shipments and payments for warranty services and dealer incentives. The Huntsville dealership continued to lose money, and, with no indication that KMA would award Edwards the Opelika dealership, Edwards sought a buyer for the Huntsville dealership. In 2004, Edwards, who had suffered continued losses, found a potential buyer for the Huntsville dealership. Pursuant to the dealership agreement between Edwards and KMA, Edwards was required to secure KMA's approval before transferring the dealership to any buyer. When Edwards asked for KMA's approval for the sale, KMA asked Edwards to sign a "Mutual Release Agreement," which provided that the parties agreed to
"release, acquit and forever discharge one another of and from all claims which have arisen or may ever arise, demands and causes of action arising from, related to, or in any manner connected with the sale and service of Kia Products, including, without limitation, the Dealer Agreement, and from any and all claims for damages, related to or in any manner connected with the Dealer Agreement or the parties' business relationship...."
*279 Edwards states that, with the deadline for closing the sale of the Huntsville dealership approaching, Edwards was afraid that KMA would not approve the sale if Edwards refused to sign the release. In December 2004, Edwards signed the release and, thereafter, completed the sale of the Huntsville dealership.
In July 2005, Edwards brought the underlying action in the federal district court, alleging violations of the Franchise Act and asserting other common-law claims. KMA moved for a partial summary judgment on those claims KMA argued were barred by the release. The court entered a summary judgment in favor of KMA on those claims, and Edwards appealed to the United States Court of Appeals for the Eleventh Circuit. The Eleventh Circuit affirmed the judgment in part and then certified to this Court this question of statutory interpretation of the Franchise Act.

Analysis
The sole issue before us is whether the language of § 8-20-11, Ala.Code 1975, and the remedial purpose of the Franchise Act permit automobile dealers to bring claims under the Franchise Act against automobile manufacturers after they have executed a mutual release of, among other claims, those then existing claims.[1] Section 8-20-11 reads as follows:
"Notwithstanding the terms, provisions, or conditions of any dealer agreement or franchise or the terms or provisions of any waiver, and notwithstanding any other legal remedies available, any person who is injured in his business or property by a violation of this chapter by the commission of any unfair and deceptive trade practices, or because he refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of this chapter, may bring a civil action in a court of competent jurisdiction in this state to enjoin further violations, to recover the damages sustained by him together with the costs of the suit, including a reasonable attorney's fee."
Edwards argues that § 8-20-11 is a remedial statute that must be interpreted broadly and that the release agreement Edwards and KMA signed thus falls within the statutory meaning of "any waiver." Edwards further argues that a broad interpretation of the phrase "any waiver" creates an exception for both prospective releasesthose dealing with issues that have not arisen at the time the release is executedand retrospective releases those dealing with issues known or accrued at the time the release is executed. Therefore, Edwards argues, it should be able to bring its claims notwithstanding the mutual release agreement it entered into with KMA.[2]
KMA argues in response that retrospective releases are favored under general Alabama law and under the Franchise *280 Act in particular.[3] KMA further asserts that § 8-20-11, Ala.Code 1975, does not encompass retrospective releases of existing claims and alleges that a construction of the Franchise Act that allows parties to bring an action under the Act despite having executed a mutual retrospective release would foster an absurd result.
After a review of the question certified to us by the United States Court of Appeals for the Eleventh Circuit and an examination of the arguments of the parties, it appears that the dispositive issue is whether the legislature intended the term "any waiver" in § 8-20-11, Ala.Code 1975, to apply to the type of mutual release agreement at issue here, or, in other words, whether the legislature intended § 8-20-11 to apply so broadly as to preclude parties subject to the Franchise Act from reaching any form of binding agreement by which then existing, ripe claims could be mutually settled without resort to a judicial determination of the claim.[4]
"This Court has held that the fundamental rule of statutory construction is to ascertain and give effect to the intent of the Legislature in enacting a statute.... If possible, a court should gather the legislative intent from the language of the statute itself.... The legislative intent may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained by its passage."
Norfolk S. Ry. v. Johnson, 740 So.2d 392, 396 (Ala.1999). We first look to the language of the statute. Although the Franchise Act, in § 8-20-3, Ala.Code 1975, defines 13 terms, neither "waiver"[5] *281 nor "release"[6] appears in that definitional section.
In § 8-20-2, Ala.Code 1975, the legislature expressed its intent in enacting the Franchise Act:
"The legislature finds and declares that the distribution and sale of motor vehicles within this state vitally affect the general economy of the state and the public interest and the public welfare, and that in order to promote the public interest and the public welfare, and in the exercise of its police power, it is necessary to regulate motor vehicle manufacturers, distributors, dealers, and their representatives and to regulate the dealings between manufacturers and distributors or wholesalers and their dealers in order to prevent fraud and other abuses upon the citizens of this state and to protect and preserve the investments and properties of the citizens of this state."
"The purpose of the [Franchise] Act is clear. It is to protect the state's citizens from abuses by motor vehicle manufacturers and dealers, and, to that end, to regulate manufacturers and dealers and the dealings between manufacturers and their dealers." Sutherlin Toyota, Inc. v. Toyota Motor Sales USA, Inc., 549 So.2d 460, 461 (1989). We have stated that the purpose of the Franchise Act is "to give balance to the inequality of bargaining power between individual dealers and their manufacturers." Tittle v. Steel City Oldsmobile GMC Truck, Inc., 544 So.2d 883, 887 (1989). The Franchise Act proscribes certain practices, such as persuading dealers to absolve the manufacturer from liability arising from the unfair trade practices enumerated in the Franchise Act. However, there is no indication of a legislative intent to prohibit the parties to an automobile-dealership franchise agreement from reaching a good-faith settlement of existing claims after those claims arise and entering into a binding settlement agreement.
Section 8-20-11, Ala.Code 1975, authorizes the dealer or the manufacturer to bring a civil action notwithstanding the terms of the dealership agreements, franchise agreements, or waivers, and notwithstanding the availability of other legal remedies. However, there is no indication that § 8-20-11 does or was intended to prohibit the settlement of known claims as an alternative to taking them to trial and ultimately to judgment. If the legislature had wished to include the settlement and release of known claims in the language of § 8-20-11, Ala.Code 1975, it knew how to do so. The legislature lists prospective releases and waivers in describing specific unfair trade practices under the Franchise Act:
"[T]he following acts or conduct shall constitute unfair and deceptive trade practices:
"....
"(3) For any manufacturer, factory branch, factory representative, distributor, or wholesaler, distributor branch or distributor representative:
"....
"(m) To prospectively assent to a release, assignment, novation, waiver, or estoppel which would relieve any *282 person from any liability or obligation under this chapter or to require any controversy between a new motor vehicle dealer and a manufacturer to be referred to any person other than the duly constituted courts of this state or the United States, if the referral would be binding on the new motor vehicle dealer ...."
§ 8-20-4(3)(m), Ala.Code 1975. The legislature did not similarly include a retrospective release as an unfair trade practice or include such a release in its list of ineffective provisions in § 8-20-11. Had the legislature meant to require the litigation of every disagreement between a manufacturer and a dealer, it could have said so.
We have read the disputed language of § 8-20-11 of the Franchise Act in the context of the entire Act. The dissent takes issue with our decision to do so. It criticizes this Court for not looking at the language of the provision in isolation, at what the dissent calls the "very plain language" of the phrase "any waiver." The dissent notes that the parties have "`conceded that the terms "waiver" and "release" can be synonymous.'" ___ So.3d at ___ (quoting Edwards v. Kia Motors of America, Inc., 486 F.3d 1229, 1233 (11th Cir.2007)) (emphasis added). Apparently, because there exists a context in which the two terms can be used synonymously, the dissent would have this Court not inquire whether, in the context of the Franchise Act, the legislature intended the terms to be synonymous. This, the dissent would have us believe, is what is meant by "plain meaning."
This Court recently stated:
"Our inquiry is governed by settled principles of statutory construction:
"`"The fundamental rule of statutory construction is that this Court is to ascertain and effectuate the legislative intent as expressed in the statute. League of Women Voters v. Renfro, 292 Ala. 128, 290 So.2d 167 (1974). In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses; Opinion of the Justices, 264 Ala. 176, 85 So.2d 391 (1956)."'"
Bright v. Calhoun, 988 So.2d 492, 497 (Ala. 2008) (quoting City of Bessemer v. McClain, 957 So.2d 1061, 1074-75 (Ala. 2006), quoting in turn Darks Dairy, Inc. v. Alabama Dairy Comm'n, 367 So.2d 1378, 1380 (Ala.1979)). "Because the meaning of statutory language depends on context, a statute is to be read as a whole." Ex parte Jackson 614 So.2d 405, 406 (Ala. 1993). In determining legislative intent our interpretation of the statutory language in § 8-20-11, therefore, must be guided by the Franchise Act as a whole, instead of simply accepting as exclusive and inevitable the possible meaning of two isolated words outside this or any other particular context. "`"A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."'" Parker v. State, 648 So.2d 653, 657 (Ala.Crim.App.1994) (quoting Lowe v. State, 54 Ala.App. 280, 284-85, 307 So.2d 86, 90 (1974) (Cates, J., concurring specially), quoting in turn Towne v. Eisner, 245 U.S. 418, 38 S.Ct. 158, 62 L.Ed. 372 (1918)). We decline to ignore the legislative intent expressed in the Franchise Act as a whole in favor of an isolated interpretation of the phrase "any waiver" that is required to produce the result the dissent would have us reach.[7]

*283 Conclusion

The remedial purpose of the Franchise Act is to address unfair trade practices between automobile manufacturers and automobile dealers in the State of Alabama. Section 8-20-11, Ala.Code 1975, protects both parties by prohibiting either from exempting its conduct from the requirements of the Franchise Act. It does not, however, render unenforceable the settlement and release of existing claims. We, therefore, answer the federal court's question in the negative.
QUESTION ANSWERED.
LYONS, WOODALL, STUART, SMITH, BOLIN, PARKER, and MURDOCK, JJ., concur.
COBB, C.J., dissents.
COBB, Chief Justice (dissenting).
I dissent. The term "judicial activism" is susceptible to many meanings; it has been referred to as a "notoriously slippery term." Frank H. Easterbrook, Do Liberals and Conservatives Differ in Judicial Activism? 73 U. Colo. L.Rev. 1401 (2002).[8] However, as this Court discusses the term in the context of the review of substantive law or statutes, see, e.g., Alabama Power Co. v. Citizens of Alabama, 740 So.2d 371 (Ala.1999), it implies a willingness on the part of the Court to invade, improperly, the province of the legislature by refusing to apply the plain meaning of the statute before us in favor of substituting language and meaning that are not otherwise present. Thus, the Court becomes a sort of "superlegislature" that imposes its particular agenda on the citizens of our State without the benefit of the usual legislative process. Certainly this is a bad thing. Not only does the Court disregard its obligations under the state and federal constitutions, but it also demonstrates an abandonment of principles that are absolutely critical to an effective system of justice. "Our system relies for its validity on the confidence of society; without a belief by the people that the system is just and impartial, the concept of the rule of law cannot survive." People ex rel. Clancy v. Superior Court of Riverside County, 39 Cal.3d 740, 746, 705 P.2d 347, 351, 218 Cal.Rptr. 24, 28 (1985).
When judicial activism is understood as the willingness of this Court to improperly substitute itself for the legislature, this case presents a picture of judicial activism that is worth a thousand words. Section 8-20-11, Ala.Code 1975, states:
"Notwithstanding the terms, provisions, or conditions of any dealer agreement or franchise or the terms or provisions of any waiver, and notwithstanding any other legal remedies available, any person who is injured in his business or property by a violation of *284 this chapter by the commission of any unfair and deceptive trade practices, or because he refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of this chapter, may bring a civil action in a court of competent jurisdiction in this state to enjoin further violations, to recover the damages sustained by him together with the costs of the suit, including a reasonable attorney's fee."
(Emphasis added.) In addition to this very plain language, this Court has also discussed the legislature's purpose in enacting the Franchise Act as "to give balance to the inequality of bargaining power between individual dealers and their manufacturers." Tittle v. Steel City Oldsmobile GMC Truck, Inc., 544 So.2d 883, 887 (Ala.1989)(emphasis added). That is, automobile dealers in this State are to receive some protection from the inequality of bargaining power that exists in their transactions with automobile manufacturers by having their claims of violations under the Franchise Act preserved for judicial adjudication, regardless of contractual releases or waivers the dealers may be compelled to sign in order to do business.
That purpose is directly applicable to this case, a situation in which an automobile dealer has been pressured into signing a release in order to effectively transact business with a much more powerful automobile manufacturer. Here, as a result of the manufacturer's unfulfilled promises, Edwards had the choice of executing the release or suffering financial ruin, essentially a choice "between a rock and a hard place." In spite of the facts presented here, and in spite of the plain language of § 8-20-11 and this Court's previous statements of law concerning the legislature's intent as stated in § 8-20-2, the majority opinion embarks on a semantic voyage to ascertain the legislature's "intent" by attempting to parse a meaningful distinction between concepts of "release" and "waiver," a distinction the parties have conceded does not exist. See Edwards v. Kia Motors of America, Inc., 486 F.3d 1229, 1233 (11th. Cir.2007) ("[D]uring oral argument, both parties conceded that the terms `waiver' and `release' can be synonymous."). The result of the majority's analysis is a conclusion that the emphasized language quoted above from § 8-20-11 does not mean what it says it means. Because I cannot, on any reasonable reading of the above statutory languageparticularly in light of the legislative purpose in enacting the Franchise Actconclude that it means other than what it says, I must conclude that the release agreement does not bar Edwards's action. In short, the majority opinion rewrites § 8-20-11 to say that certain releases and waivers do in fact operate to prevent a dealer from bringing a claim under the Franchise Act in the courts of our State. Not only does the opinion "relegislate" § 8-20-11, but it also obviates the legislature's intent as expressed in § 8-20-2 and Tittle, supra, so as to remove the protections in the Franchise Act from the inequality in bargaining power that exists between dealers and manufacturers.
In the past, this Court operated under a duty to adhere to legal precedent without regard to the outcome of the case, and it consistently concluded that the plain language of a statute required that this Court apply the language as stated. The rule has generally been stated as follows:
"`When [a] statutory pronouncement is clear and not susceptible to a different interpretation, it is the paramount judicial duty of a court to abide by that clear pronouncement.'"
Macon v. Huntsville Utils., 613 So.2d 318, 320 (Ala.1992) (quoting Parker v. Hilliard, 567 So.2d 1343, 1346 (Ala.1990)). This rule *285 has found application even in the recent past. See, e.g., Bright v. Calhoun, 988 So.2d 492, 498 (Ala.2008) (quoting City of Bessemer v. McClain, 957 So.2d 1061, 1074 (Ala.2006) ("`To discern the legislative intent [for purposes of statutory construction], the Court must first look to the language of the statute. If, giving the statutory language its plain and ordinary meaning, we conclude that the language is unambiguous, there is no room for judicial construction.'")); Boutwell v. State, 988 So.2d 1015, 1020 (Ala.2007) ("`[P]rinciples of statutory construction instruct this Court to interpret the plain language of [the] statute to mean exactly what it says and to engage in judicial construction only if the language in the statute is ambiguous.' Ex parte Pratt, 815 So.2d 532, 535 (Ala.2001)."); Cleburne County Comm'n v. Norton, 979 So.2d 766, 773 (Ala. 2007)("`"`Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"'" (quoting Tolar Constr., LLC v. Kean Elec. Co., 944 So.2d 138, 149 (Ala.2006), quoting in turn Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998), quoting in turn IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992))). I believe that the majority opinion flies in the face of this precedent and the many other cases that have espoused the principle that this Court's paramount duty is to interpret the plain language of the law to mean what it says.
With respect to the contention that giving effect to the plain language of § 8-20-11 means that no preexisting claim can ever be settled, it is more accurate to say that giving effect to the plain language of the statute means that a manufacturer may not by weight of its greater bargaining position in compelling a franchise agreement force a dealer to give up its right to adjudicate its claims of violations of the Franchise Act. Claims may still be settled by adjudication and settlement, and claims may be forestalled by honest business practices that do not give rise to violations of the Franchise Act. The statute says what it says. Had the legislature intended to except the release of known claims from the operation of § 8-20-11, it could have done so. The plain language of the statute permits litigation alleging an unfair trade practice notwithstanding prior agreements. This language may not be convenient for an entity that is stronger economically and that seeks to force a weaker one into compliance with its terms by allowing a release of known claims in the context of contract negotiations, but I submit that disregarding the language and intent of the Franchise Act is the antithesis of the "strict construction" to which judicial "conservatives" give lip service. Rather, rewriting § 8-20-11 and discarding the intent of the legislature represents judicial activism, which this Court should never endorse. Because I believe that a consistent application of this Court's principles of statutory construction is a critical component of American justice and of this Court's credibility as an agent of that justice, I must dissent.
NOTES
[1] The amici curiae brief filed by the Automobile Dealers Association of Alabama, Inc., and the National Automobile Dealers Association argues that the issue is, instead, whether the Franchise Act "encompasses retrospective releases of liability that were not the result of a good faith settlement of a bona-fide legal dispute and were not supported by adequate consideration." Amici brief at 2. However, the Eleventh Circuit Court of Appeals has not asked us to determine whether the settlement was negotiated in good faith and supported by adequate consideration, nor have the parties made this argument in their briefs.
[2] The statute does not distinguish between the dealer and the manufacturer in its definition of "[any] person." § 8-20-3(12), Ala.Code 1975. Therefore, under Edwards's theory, the manufacturer would likewise be free to sue the dealer, notwithstanding that the dealer had undertaken substantial obligations in settlement of a manufacturer's claim against the dealer under the Franchise Act.
[3] KMA bases its argument on the general law of Alabama on § 12-21-109, Ala.Code 1975: "All receipts, releases and discharges in writing, whether of a debt of record, a contract under seal or otherwise, and all judgments entered pursuant to pro tanto settlements, must have effect according to their terms and the intentions of the parties thereto." KMA argues that based on this statute, the release should be enforced according to its terms. However, we have held: "Pursuant to the principle that statutes dealing with the same subject should be read in pari materia, statutes should be construed together so as to harmonize them as much as practical, and, in the event of a conflict, a specific statute relating to a specific subject will prevail over a general statute relating to a broad subject." Peebles v. Mooresville Town Council, 985 So.2d 388, 394 n. 5 (Ala.2007) (citing Ex parte Jones Mfg. Co., 589 So.2d 208, 211 (Ala. 1991)). To the extent that the Franchise Act and § 12-21-109, Ala.Code 1975, might both apply to a release that, as in this case, is a transaction between an automobile dealer and an automobile manufacturer, the specific provisions of the Franchise Act control over the general provisions of § 12-21-109, Ala. Code 1975.
[4] As the Eleventh Circuit Court of Appeals indicates in its opinion affirming the partial summary judgment in part, the few instances of caselaw from other jurisdictions dealing with this issue are inapposite because of specific provisions in the statutes at issue in those cases that provide for the recognition of retrospective releases. Edwards v. Kia Motors of America, Inc., 486 F.3d 1229, 1235 (11th Cir.2007) (citing Sportique Motors, Ltd. v. Jaguar Cars, Inc., 195 F.Supp.2d 390, 397-98 (E.D.N.Y.2002) ("Further, [the plaintiffs] were businessmen, represented by counsel, advised of the need for the Release well before the execution thereof, and had the option to invoke [a section] of the Dealer Agreement and except the warranty reimbursement claims from the Release."), and Schmitt-Norton Ford, Inc. v. Ford Motor Co., 524 F.Supp. 1099, 1105 (D.Minn.1981) ("The state regulations adopted under the statute clearly allow good faith settlement of disputes: `Nothing herein shall be construed to limit or prohibit good faith settlements of disputes when such settlements are voluntarily entered into between the parties.' Minn.Reg.S.Div. 1718 (1976). Nothing in the provisions cited by the plaintiffs prevents settlement for past causes of action; the statute is aimed at prospective waivers of rights.")).
[5] Although the Franchise Act does not define "waiver," it is a well-settled principle of Alabama law that a "`[w]aiver is generally defined as the intentional relinquishment of a known right.' Bell v. Birmingham Broad. Co., 263 Ala. 355, 357, 82 So.2d 345, 347 (1955)." Ernst & Young, LLP v. Tucker, 940 So.2d 269, 288 (Ala.2006) (See, J., concurring specially).
[6] This Court has stated that "[a] release is a contract and must be supported by a lawful and valuable consideration; and, if not supported by a lawful consideration, is nudum pactum. Brown v. Lowndes County, 201 Ala. 437, 78 So. 815, 817." Hamilton v. Edmundson, 235 Ala. 97, 101, 177 So. 743, 746 (1937).
[7] The implication in the dissent is that the Franchise Act should be read to operate against the manufacturer and in favor of the dealer and that it is the duty of this Court to enforce such an application in favor of the one and against the other class of parties. It is instead the duty of this Court to apply the law as it is written, regardless of the identity of the parties, "dispassionately approach[ing] the issues on their merits, as we are required by oath to do." Kaylor v. State, 782 So.2d 206, 211 (Ala.2000). The language of § 8-20-11, Ala.Code 1975, that must guide us in our decision applies, as we remark in note 2, to "any person [whether manufacturer or dealer] who is injured in his business or property by a violation of this chapter by the commission of any unfair and deceptive trade practices...." (Emphasis added.) The remedies provided by the Franchise Act are thus available to the manufacturer for the dealer's unfair or deceptive trade practices delineated in § 8-20-4(2) and to the dealer for the manufacturer's unfair or deceptive trade practices delineated in § 8-20-4(1). If the one is bound, the other is also; if the one is not bound, neither is the other.
[8] See also Keenan D. Kmiec, The Origin and Current Meanings of "Judicial Activism," 92 Cal. L.Rev. 1441 (2004).