Grafton
No. 2012-193

STRIKE FOUR, LLC

v.

NISSAN NORTH AMERICA, INC.

Argued: October 11, 2012
Opinion Issued: April 12, 2013

*Holmes Law Offices PLLC*, of Concord, (*Gregory A. Holmes* on the brief and orally), and *McDowell & Osburn, P.A.*, of Manchester (*Elizabeth M. Leonard* on the brief), for the petitioner.

*Bingham McCutchen LLP*, of Boston, Massachusetts (*William N. Berkowitz & a.* on the brief, and *Mr. Berkowitz* orally), for the respondent.

*Baker Hostetler LLP*, of Columbus, Ohio (*Elizabeth A. McNellie* on the brief), and *Cullen Collimore PLLC*, of Nashua (*Brian J.S. Cullen* on the brief), for the Association of Global Automakers, Inc., as *amicus curiae*.

*Douglas, Leonard & Garvey, P.C.*, of Concord (*Charles G. Douglas, III* on the brief), for the National Automobile Dealers Association, and *Peter J. McNamara*, of Concord, by brief, for New Hampshire Automobile Dealers Association, as *amici curiae*.

CONBOY, J. The respondent, Nissan North America, Inc. (Nissan), appeals a decision of the Superior Court (*Vaughan*, J.) vacating a decision of the New Hampshire Motor Vehicle Industry Board (Board) and ruling that RSA chapter 357-C (Regulation of Business Practices Between Motor Vehicle Maufacturers, Distributors and Dealers) renders unenforceable a provision of a written settlement agreement between Nissan and the petitioner, Strike Four, LLC, a Nissan dealer (Dealer). Nissan also appeals the superior court's ruling that it was entitled to neither specific performance of the settlement agreement nor attorney's fees. We affirm in part, vacate in part, and remand.

The trial court found, or the record supports, the following facts. On July 8, 2005, Nissan issued to the Dealer a notice of termination of its dealership franchise. The Dealer filed a protest with the Board (the 2005 protest). *See generally* RSA 357-C:7 (2009 & Supp. 2012). The parties jointly moved to stay Board proceedings to allow for settlement negotiations. The Board granted this motion on October 12, 2005.

The settlement negotiations took place over two years, with both parties represented by counsel. On October 15, 2007, the parties entered into a settlement agreement that provided that the Dealer and Nissan would execute a new two-year term agreement, and the Dealer would withdraw its protest. The combined terms of the settlement agreement and the term agreement included relocation provisions (and a construction schedule for an exclusive Nissan sales facility), exclusivity provisions, and "Dealer Minimum Sales Performance" (MSP) requirements. The term agreement provided that if the Dealer failed to meet any of its obligations by the specified deadlines, or otherwise materially breached the agreements:

> Dealer shall (a) within six (6) months after the relevant Term Agreement Deadline secure a buy/sell of its Nissan dealership assets to an unrelated third party acceptable to Nissan . . . and (b) within twelve (12) months after the relevant Term Agreement Deadline, consummate the sale of its Nissan dealership assets ("First Standstill Period").
>
> . . . In no event shall Dealer be authorized to conduct Nissan Dealership Operations after the expiration of the First Standstill Period.

If the Dealer failed to meet MSP requirements, the same six-month and twelve-month benchmarks applied, but the interval was called the "Second Standstill Period." The term agreement further provided that in the event of failure to meet MSP requirements, "Dealer shall be issued a twelve (12) month term agreement for the sole purpose of achieving sale of the Nissan dealership assets," and "failure to obtain Nissan's approval for such sale or transfer within this twelve-month period shall constitute good and due cause for termination." Both parties expressly agreed that the terms of the settlement agreement and the term agreement were "fair and reasonable," and waived any right to challenge its "legality or enforceability" under RSA chapter 357-C.

On December 10, 2008, and January 14, 2009, the parties executed amendments to the term agreement, which extended its expiration date — and the date by which the Dealer was required to achieve MSP requirements — to March 11, 2011. The first amendment reiterated many of the terms of the settlement and term agreements: if the Dealer failed to achieve its sales requirements by the revised date, it would sell the dealership assets to a qualified buyer within one year thereafter; the terms of the agreement were "fair and reasonable"; and the Dealer waived the right to protest the agreements' provisions, including under RSA chapter 357-C. Hereinafter, we refer to the 2007 settlement agreement, term agreement, and the amendments collectively as the "Agreement."

By letter dated November 12, 2010, Nissan advised the Dealer that it was "highly unlikely" that the Dealer would be able to fulfill its MSP obligations under the Agreement by the March 11, 2011 deadline and suggested that the Dealer "begin now to actively [look] for potential buyers" for the dealership's assets, a search with which Nissan offered to assist. Interpreting the November 12 letter as a notice of termination, the Dealer filed a protest with the Board on December 29, 2010 (the 2010 protest). The Dealer argued that the sales performance obligations under the Agreement were unreasonable, and challenged the enforceability of the Agreement's provisions requiring the Dealer to voluntarily divest itself of the dealership assets as inconsistent with the protections of RSA chapter 357-C. On February 3, 2011, Nissan filed a counter-protest, alleging that the Dealer's actions — including initiation of the 2010 protest challenging the enforceability of provisions contained in the Agreement, which Nissan had signed in reliance upon the Dealer's express agreement that the Dealer would *not* challenge its provisions — constituted bad faith conduct in violation of RSA 357-C:3, I (2009).

While these proceedings were pending before the Board, on March 14, 2011, Nissan notified the Dealer that it had not met the MSP requirements and was therefore obligated to secure a buyer for the dealership within six

months (that is, by September 11, 2011) and to complete the sale by March 11, 2012. On August 8, 2011, Nissan again wrote to the Dealer to reiterate its "contractual obligation to divest of its Nissan dealership by March 11, 2012." As of September 11, 2011, the Dealer had not obtained a buyer for the dealership assets. By letter dated September 21, 2011, Nissan notified the Dealer of the material breach of the Agreement and called upon it to immediately present to Nissan an acceptable buyer, and to consummate the sale no later than March 11, 2012. Despite these notices, the Dealer did not sell the dealership assets.

On May 5, 2011, the Board held a hearing on the Dealer's 2010 protest and Nissan's counter-protest, at which both parties argued legal issues based upon their briefs, but neither party presented testimony or documentary evidence. On May 31, 2011, the Board dismissed the Dealer's protest and sustained Nissan's counter-protest. The Board found that both parties had entered into the Agreement in good faith and that Nissan had not cancelled or failed to renew the franchise agreement. It reasoned that the Agreement resolved a previous dispute, and therefore did not violate RSA 357-C:6 (2009), which provides that all agreements between a manufacturer and dealer are "subject to the provisions of the chapter, and provisions of such agreements which are inconsistent with this chapter shall be void as against public policy and unenforceable." *See* RSA 357-C:6. The Board specifically found that the Agreement did not deny the Dealer its right to file a termination protest if Nissan were to issue a new notice of termination. As to Nissan's counter-protest, the Board found that the Dealer's filing of the 2010 protest despite the waiver provisions of the Agreement constituted bad faith in violation of RSA 357-C:3, I. It also found that the Dealer's underperformance caused Nissan to suffer harm in the form of lost sales, but it did not award damages. The Board denied the Dealer's motion for rehearing on August 15, 2011.

On September 13, 2011, the Dealer appealed to the superior court. Nissan filed an answer and a two-count counterclaim, seeking: (1) recovery of its attorney's fees and costs pursuant to RSA 357-C:12, X (2009) based upon the Board's finding of the Dealer's bad faith; and (2) specific performance of the dealer's contractual obligation to sell the dealership assets by March 12, 2012. Nissan moved for summary judgment on both claims on January 4, 2012. The Dealer had not yet responded to the motion when the superior court issued its order, dated January 31, 2012, vacating the Board's decision, granting the Dealer's petition, denying Nissan's motion for summary judgment, and dismissing Nissan's counterclaims. The court denied Nissan's motion for reconsideration and this appeal followed.

On appeal, Nissan first argues that the superior court erred in declining to give effect to the Dealer's express waiver of its right to challenge either

the legality of the Agreement or the reasonableness of the MSP requirements, asserting that the waiver was freely and voluntarily given, that it was based upon valuable consideration, and that Nissan had relied to its detriment upon the waiver. Nissan further contends that the superior court misconstrued RSA chapter 357-C when it read the statute to invalidate certain provisions of the Agreement, and that such a reading of the statute is inconsistent with both the statutory purpose and New Hampshire's public policy favoring settlement. Nissan also appeals the superior court's denial of its petition for specific performance and request for attorney's fees. We address each argument in turn.

## I. Standard of Review

"All findings of the [B]oard upon all questions of fact properly before the court shall be prima facie lawful and reasonable," and "[n]o additional evidence shall be heard or taken by the superior court on appeals from the [B]oard." RSA 357-C:12, VII (2009). The Board's decision shall not be set aside or vacated except for errors of law. *Id.*

We review the trial court's statutory interpretation *de novo*. *Fog Motorsports #3 v. Arctic Cat Sales*, 159 N.H. 266, 267 (2009). In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Id.* at 268. When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used. *Id.* We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.* We also interpret a statute in the context of the overall statutory scheme and not in isolation. *Id.*

## II. Estoppel

Nissan first argues that the Dealer should be estopped from arguing that the Agreement is not valid. The Dealer counters that Nissan did not raise estoppel in its answer and counterclaim before the superior court, and therefore waived the issue. It further asserts that, to the extent Nissan preserved the issue, it has failed to establish the elements of estoppel.

Assuming, without deciding, that the estoppel issue was preserved, we conclude that estoppel does not preclude the Dealer from challenging the enforceability of the Agreement. "As a general rule, a party is not estopped from asserting the illegality of a contract because of his participation in or encouragement of the illegality." *Sumner Development Corporation v. Shivers*, 517 P.2d 757, 762, 762 n.14 (Alaska 1974) (collecting

cases); *see also City Lincoln-Mercury Company v. Lindsey*, 339 P.2d 851, 856 (Cal. 1959) ("A party to an illegal contract cannot ratify it, cannot be estopped from relying on the illegality, and cannot waive his right to urge that defense."). Accordingly, estoppel does not bar the Dealer from contesting the legality of the Agreement under RSA chapter 357-C.

*III. Interpretation of RSA chapter 357-C*

Nissan, joined by *amicus* Association of Global Automakers, Inc. (AGA), argues that RSA chapter 357-C does not preclude enforcement of the Agreement as written, and that the superior court erred when it invalidated portions of the Agreement as contradicting the statutory scheme. They assert that RSA chapter 357-C was not intended to regulate settlement agreements, but rather to promote settlement in accordance with New Hampshire's common law and public policy favoring voluntary resolution of disputes. Nissan further maintains that the Agreement is not inconsistent with RSA 357-C:7, governing the discontinuance of a franchise, because the voluntary sale of a franchise is not a termination and therefore is not subject to the statutory discontinuance procedures. It alternatively contends that, even if RSA 357-C:7 does apply, the Agreement satisfies all of the statutory requirements.

The Dealer, joined by *amici* National Automobile Dealers Association and New Hampshire Automobile Dealers Association, responds that the superior court correctly interpreted RSA chapter 357-C to establish a dealer's right to procedural protections that cannot be waived in advance, and that the portions of the Agreement providing otherwise — *i.e.*, providing for a severance of the manufacturer-dealer relationship without the statutory discontinuance procedures — are therefore unenforceable. We agree.

RSA 357-C:7, entitled "Limitations on Cancellations, Terminations and Nonrenewals," provides in part:

I. *Notwithstanding the terms, provisions, or conditions of any agreement or franchise, and notwithstanding the terms or provision to any waiver*, no manufacturer, distributor, or branch or division thereof shall cancel, terminate, fail to renew, or refuse to continue any franchise relationship with a licensed new motor vehicle dealer unless:

(a) The manufacturer, distributor, or branch or division thereof has satisfied the notice requirement of paragraph V;

(b) The manufacturer, distributor, or branch or division thereof has acted in good faith;

(c) The manufacturer, distributor, or branch or division thereof has good cause for the cancellation, termination, nonrenewal, or noncontinuance; and

(d) (1) The New Hampshire motor vehicle industry board finds after a hearing and after ruling on any motion to reconsider that is timely filed in accordance with RSA 357-C:12, VII, that there is good cause for cancellation, termination, failure to renew, or refusal to continue any franchise relationship. The new motor vehicle dealer may file a protest with the board within 45 days after receiving the 90-day notice. A copy of the protest shall be served by the new motor vehicle dealer on the manufacturer, distributor, or branch or division thereof. When a protest is filed under this section, the franchise agreement shall remain in full force and effect and the franchisee shall retain all rights and remedies pursuant to the terms and conditions of such franchise agreement, including, but not limited to, the right to sell or transfer such franchisee's ownership interest prior to a final determination by the board and any appeal; or

(2) The manufacturer, distributor, or branch or division thereof has received the written consent of the new motor vehicle dealer; or

(3) The appropriate period for filing a protest has expired.

(Emphasis added.) The statute thus requires four prerequisites to a manufacturer's or distributor's discontinuance of its relationship with a dealer: (1) notice; (2) good faith; (3) good cause; and (4) either the Board's determination of good cause or the dealer's acquiescence to the discontinuance, expressed either by its written consent or by its failure to protest the discontinuance in a timely manner.

RSA 357-C:6 governs the interaction between RSA chapter 357-C generally and agreements between a motor vehicle dealer and a manufacturer or distributor, providing in part:

All written or oral agreements *of any type* between a manufacturer or distributor and a motor vehicle dealer shall be subject to the provisions of this chapter, and *provisions of such agreements which are inconsistent with this chapter shall be void as against public policy and unenforceable* in the courts or the motor vehicle industry board of this state.

RSA 357-C:6, I (emphasis added). RSA 357-C:6, III likewise provides that every new selling agreement (or amendment to such agreement) shall be presumed to include the following language:

> if any provision herein, including arbitration provisions, denies or purports to deny access to the procedures, forums, or remedies provided for by [the valid laws or regulations of the state of New Hampshire], such provisions shall be void and unenforceable; and all other terms and provisions of this agreement shall remain in full force and effect.

The trial court found that "the process created by the operative provisions of the Agreement runs afoul of RSA 357-C. If [the Dealer] fails to meet these requirements established in the Agreement by a set time, then a process is triggered . . . [that] culminates in [the Dealer's] franchise ending." It noted that the structure of the Agreement "effectively requires [the Dealer] to voluntarily terminate its franchise, either by sale or forfeiture." Although it noted that voluntary termination would "not directly or overtly violate the technical language of the statute," it ruled that the Agreement's provisions purporting to define "good cause" and to avoid RSA chapter 357-C's pre-termination requirements were "exactly the type of procedure contemplated and prohibited by the statute," and are therefore invalid. The superior court ultimately ruled that "to the extent that the Agreement seeks to remove [the Dealer's] right to protest the franchise-ending process embodied in the Agreement — language that effectively creates a refusal-to-do-business timeline — the Agreement is void." We agree.

As the superior court recognized, the severance of the manufacturer-dealer relationship "by sale or forfeiture" amounts to a *de facto* discontinuance of that relationship without statutory protections. Regardless of whether the sale of the Dealer's assets is characterized as "voluntary" or otherwise, it is clear — evidenced by the letters in the record and by Nissan's claim for specific performance of the Agreement — that Nissan seeks the discontinuance of the franchise. It is similarly apparent that RSA 357-C:7, I(d), requiring either the Board to find good cause or the dealer to acquiesce to the discontinuance by filing a consent form or by allowing the protest period to lapse, was not satisfied.

■ Despite the plain language of the statute, Nissan argues that RSA chapter 357-C is not applicable to settlement agreements, since both the statutory scheme and public policy support the validity and enforcement of settlement agreements. Nissan first cites other provisions of the statutory scheme referring to the settlement of disputes. These provisions include RSA 357-C:12, IV (2009), which contemplates "a prehearing conference

where the [Board's] chairperson or designee shall have the parties address the possibility of settlement," and the Board's regulations, which likewise require it to "[h]old conferences for the settlement or simplification of issues, or for obtaining stipulations as to issues of fact or proof by the consent of the parties." N.H. CODE ADMIN. RULES, Mvi 203.01(h) (2012). However, neither of these provisions, which serve the valuable function of promoting judicial and administrative economy, vitiates the plain language of RSA 357-C:7, I(d)'s requirement that the Board find good cause or the dealer acquiesce prior to the discontinuance of the dealer-manufacturer relationship.

AGA advances a similar argument: it notes the rationale behind dealer protection statutes like New Hampshire's chapter 357-C — protection of dealers in light of their inferior bargaining power vis-à-vis manufacturers — and contends that "no reason exists to extend . . . 'anti-waiver' provisions, such as that at issue here — RSA 357-C:6 — to settlement agreements reached between a manufacturer and a dealer after a dispute has arisen." This argument runs counter to the language of the statute itself, which provides that the provisions of the chapter shall govern *"[a]ll* written or oral agreements *of any type* between a manufacturer or distributor and a motor vehicle dealer." RSA 357-C:6, I (emphasis added). If we were to hold that mandate inapplicable to settlement agreements, we would be reading into the statute a provision that the legislature did not see fit to include. To do so would contravene our rules of statutory interpretation. *See Town of Atkinson v. Malborn Realty Trust*, 164 N.H. 62, 67 (2012).

We note that some jurisdictions exempt settlement agreements from statutory anti-waiver provisions in the franchise context. *See, e.g., Sportique Motors, Ltd. v. Jaguar Cars, Inc.*, 195 F. Supp. 2d 390, 392 (E.D.N.Y. 2002) (statute provided that its provision prohibiting required releases "shall not be construed to prevent a franchised motor vehicle dealer from entering into a valid release or settlement agreement with a franchisor" (quotation omitted)); *Schmitt-Norton Ford, Inc. v. Ford Motor Co.*, 524 F. Supp. 1099, 1105 (D. Minn. 1981) ("The state regulations adopted under the statute clearly allow good faith settlement of disputes: Nothing herein shall be construed to limit or prohibit good faith settlements of disputes when such settlements are voluntarily entered into between the parties." (quotation omitted)). However, because "[w]e interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include," *Fog Motorsports*, 159 N.H. at 268, we read RSA chapter 357-C to govern *"[a]ll* written or oral agreements *of any type* between a

manufacturer or distributor and a motor vehicle dealer," RSA 357-C:6, I (emphasis added), including settlement agreements.

■ Nissan next argues that the statute is inapplicable to the Agreement because RSA 357-C:7 distinguishes between voluntary waivers and releases by dealers, including the Agreement, and those which a manufacturer requires. To this end, Nissan highlights the behavior prohibited under RSA 357-C:3, III(m) (2009) and RSA 357-C:3, III(p)(3) (Supp. 2012):

It shall be deemed an unfair method of competition and unfair and deceptive practice for any:

. . .

III. Manufacturer; distributor; distributor branch or division; factory branch or division; or any agent thereof to:

. . .

(m) Require a motor vehicle dealer to assent to a release assignment, novation, waiver or estoppel which would relieve any person from liability imposed by this chapter;

. . .

(p) Require a motor vehicle franchisee to agree to a term or condition in a franchise, or in any lease related to the operation of the franchise or agreement ancillary or collateral to a franchise, as a condition to the offer, grant, or renewal of the franchise, lease, or agreement, which:

. . .

(3) Requires that disputes between the motor vehicle franchisor and motor vehicle franchisee be submitted to arbitration or to any other binding alternate dispute resolution procedure; provided, however, that any franchise, lease, or agreement may authorize the submission of a dispute to arbitration or to binding alternate dispute resolution if the motor vehicle franchisor and motor vehicle franchisee voluntarily agree to submit the dispute to arbitration

> or binding alternate dispute resolution at the
> time the dispute arises . . . .

Nissan asserts that because the Dealer was not "required" to assent to a release or waiver, but rather entered into the Agreement voluntarily, RSA 357-C:3, III(m) supports enforcement of the waiver. Logic does not support this argument: the fact that RSA 357-C:3 *prohibits* a manufacturer from *requiring* a dealer to assent to a waiver or release does not mean that a voluntarily-entered waiver vitiates the statutory protections of RSA 357-C:7.

█ The cases Nissan cites for the proposition that voluntarily-entered releases do not violate dealer protection statutes are likewise inapplicable to our analysis; the Dealer does not allege that Nissan violated the statute by requiring it to sign the Agreement, but rather contends that certain provisions of the Agreement are unenforceable because they conflict with RSA 357-C:7. *See Rochester Ford Sales, Inc. v. Ford Motor Co.,* No. Civ. 99-559-M, 2001 WL 799594, at *3 n.1 (D.N.H. June 21, 2001), *aff'd*, 287 F.3d 32 (1st Cir. 2002); *Hyman v. Ford Motor Co.,* 142 F. Supp. 2d 735, 746 (D.S.C. 2001). Likewise, the provision that dealer/manufacturer agreements "may authorize the submission of a dispute to arbitration" or other binding dispute resolution procedures "at the time the dispute arises" has no effect upon the protections of RSA 357-C:7, I(d) in the context of a discontinuance of the manufacturer/dealer relationship. Indeed, RSA 357-C:3, III(p)(3) demonstrates that when the legislature intended to create an exception for voluntary agreements, allowing them to be effective in specific circumstances, it knew how to do so. *See also* RSA 347-A:10 (2009) (voiding agricultural equipment supply contracts that would require a dealer to waive compliance with RSA chapter 347-A, but providing that "[n]othing in this chapter shall be construed to limit or prohibit good faith settlements of disputes voluntarily entered into between the parties"). The legislature did not include any specific exception to the requirements of RSA 357-C:7, I.

Nissan next argues for a distinction between the protections afforded by RSA 357-C:7, I, which it characterizes as applicable only to unilateral terminations by the automobile manufacturer, and those of RSA 357-C:7, VI, which apply to any discontinuance of the dealer-manufacturer relationship, whether unilateral or consensual. We disagree. Nissan maintains that because the Agreement expresses a mutually agreed-upon discontinuance rather than one unilaterally imposed by Nissan, RSA 357-C:7, I, does not govern, supporting its argument by citing *Mazda Motors of America, Inc., v. Southwestern Motors, Inc.,* 250 S.E.2d 250, 253 (N.C. 1979). Nissan also argues that the Agreement requires the Dealer to engage only in a

voluntary sale, rather than a termination, and therefore the Agreement is not subject to RSA 357-C:7's protections.

■ We are not persuaded by Nissan's argument that RSA 357-C:7, I, does not apply to the Agreement because a separate subsection, RSA 357-C:7, VI, imposes dealer protections in the form of manufacturer buyback requirements after termination, cancellation, or nonrenewal of a franchise, either "as provided for in this section, *or . . . by the motor vehicle franchisee*" (emphasis added). Whether a purely franchisee-initiated discontinuance would be subject to the statutory discontinuance procedures of subsection I, is not an issue before us; here, Nissan informed the Dealer that it was obligated to divest itself of its Nissan assets and that "[i]n no event shall Dealer be authorized to conduct Nissan Dealership Operations" after the franchise sale deadline provided in the Agreement. Under these circumstances, we do not conclude that the Dealer initiated the discontinuance. Therefore, the provisions of RSA 357-C:7, I, control. Nor are we persuaded that the legislature's 2009 amendment of subsection VI, which enhanced dealer protections under RSA 357-C:7 by requiring the manufacturer to buy back its inventory upon discontinuance regardless of which party initiated the franchise termination, in any way limits the procedural discontinuance requirements of RSA 357-C:7, I.

■■ Similarly unavailing is Nissan's argument that the Agreement is not subject to the statutory discontinuance procedures because it reflects a mutual, rather than unilateral, discontinuance. RSA 357-C:7, I, is not limited to unilateral terminations. Rather, the legislature has determined that "notwithstanding the *terms or provision to any waiver*, no manufacturer . . . shall . . . *refuse to continue* any franchise relationship with a licensed new motor vehicle dealer unless" the four statutory requirements are satisfied. RSA 357-C:7, I (emphasis added). The legislature's intent, that a manufacturer comply with the statutory discontinuance procedures even in cases where the dealer acquiesces to the discontinuance, is apparent from reading subsection I(d) in connection with section IV. Under RSA 357-C:7, I(d)(2), even when "[t]he manufacturer, distributor, or branch or division thereof has received the written consent of the new motor vehicle dealer," sufficiently to satisfy the fourth statutory discontinuance requirement, the manufacturer is nonetheless required to satisfy the other three discontinuance requirements under subsections I(a), (b) and (c). *See* RSA 357-C:7, IV ("The manufacturer . . . shall bear the burden of proof for showing that it has acted in good faith, that all notice requirements have been satisfied, and that there was good cause for the franchise termination, cancellation, nonrenewal or noncontinuance.").

Also unpersuasive is the judicial authority Nissan cites as support for its argument that settlement agreements do not fall within RSA 357-C:7, I's mandate that its provisions apply "notwithstanding the terms or provisions to any waiver." It is true that in the *Mazda* case, the North Carolina Supreme Court held that the franchise termination requirements of that state's statute apply solely to unilateral terminations by the manufacturer and not to mutual agreements between manufacturer and dealer. *See Mazda*, 250 S.E.2d at 253. However, the North Carolina statute did not provide for its applicability *"notwithstanding . . .* any *waiver,"* as our statute provides. RSA 357-C:7, I (emphasis added); *cf. Mazda*, 250 S.E.2d at 252. Moreover, the dealer in that case apparently did not appeal the manufacturer's termination to the commissioner of motor vehicles, as provided for by statute, but rather sought to bar the manufacturer from its premises when the manufacturer sought to "take an inventory of parts." *See id.* at 251 (history/summary). Here, by contrast, the dealer is attempting to enforce the provisions of the statute.

Nissan also relies upon *Edwards v. Kia Motors of America, Inc.*, 8 So. 3d 277 (Ala. 2008). But given the language of Alabama's governing statute, *Edwards* does not support Nissan's argument. In *Edwards*, in connection with a manufacturer's approval for sale of a dealership, the dealer executed a full mutual release of all then-existing claims with the manufacturer, sold the dealership to a third party, and then sought damages from the manufacturer under Alabama's franchise act and other common-law theories; the dealer made no claim for wrongful termination. *See id.* at 278-79. The Alabama statute at issue provided:

> Notwithstanding the terms, provisions, or conditions of any dealer agreement or franchise or the terms or provisions of any waiver, and notwithstanding any other legal remedies available, any person who is injured in his business or property by a violation of this chapter by the commission of any unfair and deceptive trade practices, or because he refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of this chapter, may bring a civil action in a court of competent jurisdiction in this state to enjoin further violations, to recover the damages sustained by him together with the costs of the suit, including a reasonable attorney's fee.

*Id.* at 279 (quotation omitted). The former dealer, Edwards, argued "that a broad interpretation of the phrase 'any waiver' create[d] an exception for both prospective releases — those dealing with issues that have not arisen at the time the release is executed — and retrospective releases — those dealing with issues known or accrued at the time the release is executed."

*Id.* The *Edwards* court articulated the dispositive issue as whether the Alabama legislature intended the term "any waiver" "to apply so broadly as to preclude parties subject to the Franchise Act from reaching any form of binding agreement by which *then existing, ripe claims* could be mutually settled without resort to a judicial determination of the claim." *Id.* at 280 (emphasis added). In reaching its conclusion that the Alabama legislature did not intend such a result, the *Edwards* court noted that Alabama's statute considered it an "unfair and deceptive trade practice[ ]" for an automobile manufacturer

> [t]o *prospectively* assent to a release, assignment, novation, waiver, or estoppel which would relieve any person from any liability or obligation under this chapter or to require any controversy between a new motor vehicle dealer and a manufacturer to be referred to any person other than the duly constituted courts of this state or the United States, if the referral would be binding on the new motor vehicle dealer . . . .

*Id.* at 281-82 (quotation omitted; emphasis added). It reasoned, "The legislature did not similarly include a retrospective release as an unfair trade practice or include such a release in its list of ineffective provisions . . . . *Had the legislature meant to require the litigation of every disagreement between a manufacturer and a dealer, it could have said so."* *Id.* at 282 (emphasis added).

Here, by contrast, the Agreement was not purely a retrospective release: although it settled the 2005 Protest, it also included a *prospective* waiver of procedural remedies. This distinction alone distinguishes *Edwards*. In addition, our statute contains an explicit provision rendering the chapter's provisions applicable to *"[a]ll* written or oral agreements *of any type* between a manufacturer or distributor and a motor vehicle dealer." RSA 357-C:6, I (emphasis added).

 Nor does the general public policy in favor of enforcing settlement agreements persuade us that the legislature intended to exclude such agreements from the "notwithstanding the terms or provisions of any waiver" language of RSA 357-C:7. Nissan correctly recognizes the general policy of this state favoring the settlement of civil matters. *See, e.g., Estate of Day v. Hanover Ins. Co.*, 162 N.H. 415, 421 (2011); *Hogan Family Enters. v. Town of Rye*, 157 N.H. 453, 456 (2008). "Generally, parties are free to settle a case on any terms they desire and *that are allowed by law." Poland v. Twomey*, 156 N.H. 412, 414-15 (2007) (emphasis added). But, in evaluating whether the provisions of RSA 357-C:7, I, can be waived, we note the unusually broad language of RSA 357-C:6, I:

> *All* written or oral agreements *of any type* between a manufacturer . . . and a motor vehicle dealer shall be subject to the provisions of this chapter, and provisions of such agreements which are inconsistent with this chapter shall be void as against public policy and unenforceable in the courts or the motor vehicle industry board of this state.

(Emphasis added.) Such broad language, in a remedial statute, precludes parties from contracting around the mandatory pre-discontinuance procedures set forth by statute. Supporting this interpretation is the purpose of the statute — to protect dealers. *See Roberts v. General Motors Corp.*, 138 N.H. 532, 536 (1994) ("[C]hapter 357-C is a comprehensive statute governing the relationships between automobile manufacturers and their dealers. The clear intent of the nonconsumer-oriented provisions is to protect the investment and property interests of those who are already dealers.").

Because our holding is based upon a conflict between the terms of the Agreement and the language of the controlling statute, we are not persuaded by the argument that the result here represents an "unsound public policy" discouraging parties from agreeing to settlements. *See Estate of Day*, 162 N.H. at 421. Under the provisions of the statute, parties can still agree to a wide range of settlement terms; they may not, however, contract to waive the protections of the statute itself. As the superior court noted, "Settlements that do not violate the provisions of RSA 357-C are routinely drafted and enforceable, and certainly portions of this Agreement may well be enforceable." Because the Agreement provided for the severance of the manufacturer-dealer relationship, however, compliance with RSA 357-C:7 is required. The provisions of the Agreement providing otherwise are therefore unenforceable.

Having determined that RSA 357-C:7 applies, we turn to Nissan's argument that the requirements of RSA 357-C:7, I, were satisfied. Nissan contends that the Agreement itself constitutes the Dealer's "written consent" for the purposes of RSA 357-C:7, I(d)(2), and that the Agreement also stipulates to "good cause." "As regards the notice and good faith requirements of RSA 357-C:7," it argues, the "Agreement itself provided ample notice of the applicable deadline for achieving MSP, and thereafter Nissan repeatedly notified [the Dealer] of its failure to achieve the agreed-upon sales levels," and the Board found that Nissan had acted in good faith.

We disagree that the Agreement satisfied the statutory discontinuance requirements. RSA 357-C:7, I, provides:

> Notwithstanding the terms, provisions, or conditions of any agreement or franchise, and *notwithstanding the terms or provision to any waiver,* no manufacturer, distributor, or branch or division thereof shall cancel, terminate, fail to renew, or refuse to continue any franchise relationship with a licensed new motor vehicle dealer unless [the following requirements are satisfied].

(Emphasis added.) Given this explicit anti-waiver provision, we conclude that the specified discontinuance requirements cannot be satisfied by agreement predating a notice of discontinuance. Further, the notice requirement cannot be "built into" an agreement; it must be provided at the time the manufacturer actually determines to seek discontinuance of the franchise. *See* RSA 357-C:7, I(a), V. To conclude otherwise would render the "notwithstanding" language of RSA 357-C:7, I, meaningless. *See, e.g., Appeal of Wilson,* 161 N.H. 659, 664 (2011) (we will not interpret a statute so as to render it meaningless).

■ Likewise, the "written consent" that will satisfy RSA 357-C:7, I(d) cannot be granted by agreement in advance of a manufacturer's notice of discontinuance of the franchise because such would constitute an invalid waiver under the statute. Thus, although the statute permits franchise terminations by consent, such consent may be given only after proper notice. To conclude otherwise would contravene the options granted by RSA 357-C:7, I(d) to a dealer faced with a notice of termination or discontinuance: the dealer can consent, in writing, to the termination, *see* RSA 357-C:7, I(d)(2); it can protest the termination to the Board, *see* RSA 357-C:7, I(d)(1); or it can acquiesce to the termination by allowing the protest period to lapse, *see* RSA 357-C:7, I(d)(3).

■ Here, the Agreement cannot be regarded as a "consent" to discontinuance because the agreement does not, in fact, discontinue the franchise. To the contrary, the Agreement contemplates that the franchise will continue; the termination provisions are contingent upon certain conditions not being met by the Dealer within a set time period. Because the Agreement sets forth the terms of a continuing manufacturer-dealer relationship, the provisions relating to discontinuance of that relationship constitute an impermissible prospective waiver. *See* RSA 357-C:7, I.

Because the statutory franchise discontinuance requirements have not been satisfied, we affirm the decision of the superior court ruling that "to the extent that the Agreement seeks to remove [the Dealer's] right to protest the franchise-ending process embodied in the Agreement — language that effectively creates a refusal-to-do-business timeline — the Agreement is void," and its order vacating the Board's order to the extent

that it ruled otherwise. We note that, should Nissan initiate termination proceedings, and should the Dealer opt to protest any discontinuance under RSA 357-C:7, I(d)(1), the Board may consider the terms of the Agreement and the actions of the parties, as well as any other evidence that may properly bear on the issues of good faith and good cause, in making its determination.

## IV. Specific Performance

In light of our holding that the Agreement is unenforceable to the extent that it provides for severance of the dealer-manufacturer relationship in the absence of compliance with the procedures set forth in RSA 357-C:7, we need not address Nissan's claim for specific performance.

## V. Attorney's Fees

Nissan argues that it is entitled to an award of attorney's fees and costs because it was the prevailing party on its counter-protest under RSA 357-C:3. Nissan alleges that the Dealer acted in bad faith by inducing Nissan to rely upon its assurances that the Agreement was fair and reasonable, that the Dealer would not challenge its enforceability, and that the Dealer would voluntarily sell the franchise if it could not meet the MSP requirements within the specified time frame. In support of its claim of bad faith before the superior court, Nissan highlighted the period of years following the 2005 protest, during which the Dealer "received all the benefits of [the] Agreement — by holding itself out as a Nissan dealer" (emphasis omitted), without ever raising the question of the Agreement's legality or enforceability: "[o]nly when the final deadline approached did [the Dealer] reveal its plan to avoid its obligation to sell the dealership, by claiming — for the first time — that the Agreement was illegal and unenforceable." Nissan contends that the superior court erred as a matter of law in determining that it was not entitled to attorney's fees based upon its findings that "[the Dealer] has not failed to show good cause and Nissan is not the prevailing party."

The Dealer counters that the Board's ruling in Nissan's favor was vitiated by the superior court's ruling that the franchise-ending provisions of the Agreement are void, and that "it is illogical that a party who prevails in Superior Court can do so in bad faith and be required to pay the losing party's attorney's fees and costs." It further argues that "[t]he mere filing of a protest to challenge the legality of an agreement does not constitute bad faith under New Hampshire law," and that there was no evidence on which the Board could base any factual findings. It also asserts that RSA chapter 357-C applies exclusively to a manufacturer's bad faith conduct toward a dealer.

■ RSA 357-C:12, X provides: "In cases where the board finds that a violation of this chapter has occurred . . . the superior court, upon petition, shall determine reasonable attorney's fees and costs and award them to the prevailing party." RSA 357-C:3, I, the provision under which Nissan asserts that it is the prevailing party because the Board granted its counter-protest, provides in pertinent part:

> It shall be deemed an unfair method of competition and unfair and deceptive practice for any:
>
> I. Manufacturer . . . or motor vehicle dealer to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of such parties or to the public . . . .

The statute, by its terms, thus applies to bad faith actions by either Nissan or the Dealer.

We reject the Dealer's argument that the superior court's ruling as to the unenforceability of the franchise-ending provisions of the Agreement precludes a finding that Nissan is entitled to recover attorney's fees. That the Dealer has prevailed on its claims regarding the franchise-ending terms of the Agreement does not foreclose a finding in Nissan's favor on its claim for attorney's fees based upon the Dealer's alleged violation of RSA 357-C:3, I (prohibiting bad faith conduct by either manufacturer or dealer) if the evidence supports such a finding. In arguing that we should uphold the Board's finding of bad faith by the Dealer, Nissan asserts that the Board's finding of bad faith was not "dependent upon a determination that the . . . Agreement was lawful and binding." However, the Board's finding was based, in part, upon its view that the Dealer acted in bad faith by seeking to open the prior protest, which had been dismissed with prejudice, and in failing to abide by its obligations under the Agreement. Because the Board assumed the enforceability of all of the terms of the Agreement, its finding is not controlling.

■ Nonetheless, our conclusion regarding the unenforceability of the franchise-ending provisions of the Agreement does not necessarily vitiate Nissan's bad faith claim. Nissan has alleged that the Dealer forestalled its termination from 2005 through two years' worth of negotiations, at the conclusion of which it agreed that the Agreement's terms were fair and reasonable; that the Dealer then forestalled termination for another four years (during which time it received Nissan's approval for extensions of time and relocated twice); and that, only after receiving many years' worth of the benefits attributable to its status as a Nissan dealer did the Dealer "reveal its plan to avoid its obligation to sell the dealership, by claiming — for the first time — that the Agreement was illegal and unenforceable."

Because Nissan's statutory claim for fees is based upon the Dealer's alleged bad faith conduct — that is, actions outside the four corners of the Agreement — the unenforceability of certain of the provisions of the Agreement does not necessarily dictate the result of that claim.

Whether the Dealer acted in bad faith under these circumstances is a factual determination. *See Certain Underwriters at Lloyd's London v. The Home Ins. Co.*, 146 N.H. 740, 744 (2001). Because the record reflects a genuine issue of material fact on this question, remand to the Board is necessary. *See Bartlett v. City of Manchester*, 164 N.H. 634, 643 (2013) (remanding to superior court for remand to administrative board where mixed question of law and fact necessitated development of a factual record). In light of our ruling herein, the Board shall determine whether, under all the circumstances, the Dealer acted in bad faith. If the Board so finds, the superior court, upon petition, shall determine reasonable attorney's fees and costs to be awarded to Nissan. *See* RSA 357-C:12, X. Accordingly, we vacate the superior court's dismissal of Nissan's claim for attorney's fees and remand for further proceedings in accordance with this opinion.

*Affirmed in part; vacated in part; and remanded.*

DALIANIS, C.J., and HICKS, LYNN and BASSETT, JJ., concurred.