NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

State Board of Education
No. 2015-0030

APPEAL OF DUNBARTON SCHOOL DISTRICT
(New Hampshire State Board of Education)

Argued: September 24, 2015
Opinion Issued: May 13, 2016

Sulloway & Hollis, P.L.L.C., of Concord (Edward M. Kaplan and Sarah S. Murdough on the brief, and Mr. Kaplan orally), for Goffstown School District.

Devine, Millimet & Branch, Professional Association, of Manchester (Daniel E. Will and Joshua M. Wyatt on the brief, and Mr. Will orally), for Dunbarton School District.

Joseph A. Foster, attorney general (Brian W. Buonamano, assistant attorney general, by brief), for New Hampshire State Board of Education, as amicus curiae.

DALIANIS, C.J. The Dunbarton School District (Dunbarton) appeals a decision of the New Hampshire State Board of Education (Board) which determined that Dunbarton is liable to the Goffstown School District (Goffstown) for its proportional share of Goffstown's obligation on a 20-year

construction bond approved in 2001 for renovations to the Goffstown High School. We reverse.

I. Background

The pertinent facts follow. Enacted in 1963, RSA chapter 195-A allows the establishment of Authorized Regional Enrollment Area (AREA) schools. See Laws 1963, ch. 277. The purpose of the statute is "to increase educational opportunities within the state by encouraging the establishment of area schools in the receiving districts which will serve the receiving district and the sending districts throughout a natural social and economic region . . . to permit efficient use of such area school facilities and to provide improved instruction." RSA 195-A:2, I (2008). The statute sets forth detailed procedures for establishing an AREA plan, see RSA 195-A:3 (Supp. 2015), and for the periodic review of AREA plans and withdrawal of districts from the AREA, see RSA 195-A:14 (2008).

Under the statute, an "'[a]rea school'" is defined as "an authorized regional enrollment area school, which may be elementary or secondary, and which when approved . . . shall be the assigned school for all the resident elementary or secondary pupils of the school districts or portions thereof within the region which it is established to serve." RSA 195-A:1, IV (2008). A "'[s]ending district'" is defined as "any school district or portion thereof which sends its resident pupils to an area school located in a receiving district, paying tuition therefor to the receiving district." RSA 195-A:1, V (2008). A "'[r]eceiving district'" is defined as "a school district in which an area school is located." RSA 195-A:1, VI (2008).

An AREA plan must include, among other things, a formula for the calculation of tuition. RSA 195-A:3, V(d) (Supp. 2015). "'Tuition'" is defined as "the sum of money which each sending district is obligated to pay to the receiving district to defray the cost of education" and "may include an annual rental charge per pupil." RSA 195-A:1, IX (2008). "'Annual rental charge per pupil'" is defined as "that additional payment included in tuition . . . which represents a fair charge for building occupancy. It may also include a fair charge for any debt service and reduction of principal, which may become due between date of bond issue and date of building occupancy." RSA 195-A:1, X (2008).

In 1971, Goffstown, Dunbarton, and the New Boston School District entered into a written AREA plan pursuant to which Goffstown was designated the receiving school district and Dunbarton and New Boston were designated the sending school districts. The plan established an annual tuition rate that included a rental charge of two percent. At the time the parties entered into this AREA plan, the statute did not require that an AREA plan contain a term of duration. See Laws 1969; 347:2.

2

In 1998, the Goffstown Building Needs Study Committee recommended a $10 million plan for renovations and additions to the Goffstown High School and the development of plans for an additional elementary school.  The Goffstown school board decided to delay putting the question to public vote for one year.  In 1999, a similar renovation plan was recommended by the committee but it was defeated in March 2000.  Thereafter, a High School Building Study Committee was formed and, subsequently, it proposed an $11,995,000 plan to renovate Goffstown High School.

In November 2000, a written memorandum was sent on behalf of the Goffstown School Board to the school boards of Dunbarton and New Boston, notifying them that "the Goffstown School District will be proposing a building project at the March 2001 School District Meeting.  The total cost of the project is $11,995,000.  The Board is proposing a 20-year bond.  The project encompasses renovations and additions to the Goffstown AREA High School."  In March 2001, Goffstown voters authorized the Goffstown School District to issue bonds to raise $11,995,000 for the "Renovation/Addition Project" for the Goffstown AREA High School.  See RSA 195-A:7 (2008) ("[T]he construction of additions or alterations to existing buildings, . . . shall be the responsibility of the receiving district . . . .  A receiving district may borrow money for such purposes.").

In 1999, the legislature amended RSA chapter 195-A to require that AREA plans have a minimum term of 10 years "unless otherwise provided by mutual agreement of the school districts."  Laws 1999, 15:1.  Accordingly, in January 2004, Goffstown, Dunbarton, and New Boston agreed to a new written AREA plan to replace the 1971 plan.  The 2004 AREA plan established a term of 10 years, with July 1, 2004 as the start date.  Among other things, the plan established an annual tuition rate that included a rental charge of two and one-half percent effective July 1, 2005, to be recalculated based upon appraisals of the Goffstown middle school and high school buildings "performed every five years commencing in 2008."  The plan provided that "[o]n the effective date of this Agreement, any former AREA agreements between Goffstown, New Boston and Dunbarton shall become void."  In April 2004, the Board certified that the plan was "lawfully adopted."

Before the 2014 expiration of the parties' AREA plan, an AREA planning review board, comprised of representatives from each of the three participating school districts, reviewed the 2004 plan and discussed possible amendments to be included in a new plan.  See RSA 195-A:14, I.  The review board subsequently submitted a proposed AREA plan that, with the Board's approval, would be voted upon in all three districts at the 2013 annual school district meetings.  In January 2013, the Board approved the amended AREA plan.  At the same time, the Board approved a plan to form a new AREA school designating Bow as the receiving district and Dunbarton as the sending district.  Dunbarton and Bow voters approved the Dunbarton/Bow AREA plan,

3

and Dunbarton voters rejected the amended Goffstown/Dunbarton/New Boston AREA plan.

In January 2014, Goffstown requested a hearing before the Board to determine Dunbarton's remaining obligation on the 2001 bond. At a pre-hearing conference, the parties agreed to submit memoranda on the legal issue of whether Dunbarton "is or is not responsible for capital costs after the expiration of the AREA Agreement." After reviewing the parties' written submissions, the hearing officer determined that, upon receiving notice from Goffstown in 2001 that it was going to renovate and make additions to the high school and was proposing a 20-year bond to finance the project, Dunbarton was required, pursuant to RSA 195-A:14, VI, to initiate a withdrawal study four months before the vote or it would remain obligated on the bond.

The hearing officer reasoned that, "[b]y initiating the withdrawal study, Dunbarton would have put Goffstown on notice prior to the bond as to the potential additional financial risk on the bond without Dunbarton remaining part of the AREA." Thus, although the 2004 AREA plan expired June 30, 2014, "Dunbarton was clearly on notice back in 2001 that there was a twenty (20) year bond, and had the opportunity to initiate a withdrawal study at that point in time so that Goffstown would be on notice of the possible financial ramifications of Dunbarton withdrawing from the AREA." Accordingly, the hearing officer recommended that the Board find that Dunbarton remains financially obligated with respect to the high school construction bond. The Board voted to accept the hearing officer's report and adopted his recommendation. Dunbarton's request for reconsideration was denied, and this appeal followed.

II.  Standard of Review

RSA chapter 541 governs our review of Board decisions. See RSA 21-N:11, III (2012). Under RSA 541:13, a party seeking to set aside a decision of the Board has the burden of demonstrating that the decision "is clearly unreasonable or unlawful." RSA 541:13 (2007). We will not disturb the Board's decision, except for errors of law, unless we are satisfied, by a clear preponderance of the evidence before us, that it is "unjust or unreasonable." Id. The Board's findings of fact are presumed prima facie lawful and reasonable. Id. We review the Board's rulings on issues of law de novo. See Appeal of Hillsborough County Nursing Home, 166 N.H. 731, 733 (2014).

To resolve the issues before us, we must engage in statutory interpretation. The interpretation of a statute is a question of law, which we review de novo. Favazza v. Braley, 160 N.H. 349, 351 (2010). In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. Id. In construing its meaning, we first examine the language found in the statute, and when

4

possible, we ascribe the plain and ordinary meanings to the words used.  Id.
We interpret legislative intent from the statute as written and will not consider
what the legislature might have said or add language that the legislature did
not see fit to include.  Strike Four v. Nissan N. Am., 164 N.H. 729, 735 (2013).
We interpret statutory provisions in the context of the overall statutory scheme.
Favazza, 160 N.H. at 351.  Absent an ambiguity, we will not look beyond the
language of the statute to discern legislative intent.  See New Hampshire Health
Care Assoc. v. Governor, 161 N.H. 378, 385 (2011).

III.  RSA Chapter 195-A

The parties agree that three statutory provisions are dispositive of the
issues raised on appeal:  RSA 195-A:14, V and VI, and RSA 195-A:3, XI.
Paragraph XI of RSA 195-A:3 is part of the procedure for establishing an AREA
school.  Under that procedure, a written AREA plan must be prepared and
must include, among other things, "[t]he term of the agreement, which shall be
for a minimum of 10 years unless otherwise provided by mutual agreement of
the school districts consistent with the provisions of RSA 195-A:3, XI."  RSA
195-A:3, V(n).  Paragraph XI, in turn, provides that

[a]n area plan . . . shall be valid for a minimum of 10 years unless
otherwise provided by mutual agreement of the school districts.
The area plan may be renegotiated at the request of a sending or
receiving district or extended for additional 10-year periods upon a
mutual vote of each sending and receiving school district legislative
body 2 years prior to the expiration of the area plan.

RSA 195-A:3, XI.

Paragraphs V and VI of RSA 195-A:14 concern the "Review of Area Plan
and Withdrawal of Districts."  RSA 195-A:14 (bolding omitted).  Pursuant to
RSA 195-A:14, "[a]fter the third anniversary of the date of operating
responsibility," either a sending or receiving district "may vote to undertake a
study of the feasibility and suitability of a withdrawal from the area."  RSA
195-A:14, III.  A study committee must be formed and, within 180 days, submit
a report to the Board "that withdrawal is not feasible or suitable or a report
that includes a withdrawal plan prepared in accordance with paragraph IV."
Id.  A plan for the withdrawal of a district from an AREA must include, among
other things, "[t]he liability of the withdrawing district for its share of any
outstanding indebtedness of the area in accordance with paragraph V."  RSA
195-A:14, IV(c).  Paragraph V, in turn, provides that "[e]ach withdrawing
sending district shall remain liable to the area, or to the receiving district in the
case of dissolution of the area, for a rental charge, as determined by the area
agreement, for the length of any outstanding bond issue."  RSA 195-A:14, V.

Under paragraph VI of RSA 195-A:14, four months before a vote on a bond issue for construction of new facilities or additions to an AREA school, a receiving district must notify a sending district of such pending vote, and the sending district may thereafter "initiate a withdrawal study." RSA 195-A:14, VI. If the sending district does so and the voters in the sending district approve the withdrawal plan, "the sending district shall not be further obligated to any bonded indebtedness as a result of such bond issue." Id.

IV. Appellate Arguments

Dunbarton argues that RSA chapter 195-A "envisions two possible endings to an area relationship: (1) withdrawal by one party; and (2) expiration of the area agreement." It contends that "[e]ach method of termination is distinct and creates different consequences for the contracting parties." According to Dunbarton, withdrawal "occurs during the term of an area plan," and because of "the potential consequences to students of termination mid-stream in the term of an area plan, the statute lays out a detailed and deliberate process and requires Board input before withdrawal or dissolution may occur." By contrast, "[e]xpiration . . . occurs simply because an area plan reaches its term." That is what occurred with respect to the 2004 plan, "and the parties neither contracted for, nor does the statute impose, any post-termination obligations upon either party." Thus, Dunbarton argues, "it is only where an area relationship terminates . . . before the end of its term through 'withdrawal' that the statute imposes liability for payments on outstanding bond issues" pursuant to RSA 195-A:14, V. Consequently, "[t]he Board unlawfully and unreasonably categorized Dunbarton as a 'withdrawing' sending district because Dunbarton never withdrew; instead, the 2004 Contract expired by its terms and with it, any further obligation for Dunbarton to pay Goffstown."

Goffstown argues that the Board "properly gave effect to the plain language of RSA 195-A:14, VI, which sets forth the clear statutory duty of a sending district to initiate a withdrawal study prior to a receiving district's vote on a bond if the sending district wishes to avoid its financial obligation for the term of the bond." Goffstown asserts that the statutory obligation imposed under RSA 195-A:14, VI "was not erased by the Amended Area Plan entered into in 2004 or the expiration of that plan in 2014." According to Goffstown, not only does Dunbarton's analysis render RSA 195-A:14, VI "meaningless," it also "would lead to the absurd result that a receiving district could never incur new bond indebtedness during the term of an AREA plan with the assurance that a sending district would remain obligated for the full term of the bond." Goffstown argues that, under Dunbarton's analysis, "[a] sending district could remain silent and not initiate withdrawal, thereby leaving the false impression that it remained committed to the bond issue, yet simply walk away at the end of the term of the plan, leaving the receiving district the unanticipated burden of the remainder of the entire bond obligation."

6

After briefing and oral argument, we invited the attorney general (State) to submit a brief as amicus curiae on behalf of the Board. The State asserts that "[t]he Board's interpretation [of RSA 195-A:14] is consistent with the legislature's intent that a receiving district be protected relative to its investments in an area school in the event of an area dissolution." The State argues that, read together, RSA 195-A:14, V and VI require a sending district to remain liable for any outstanding bond issue following the expiration of an AREA agreement. According to the State, these two statutory provisions "together protect the relative interests of receiving districts and sending districts, respectively, when capital investments are made in area schools." Paragraph VI "protects a sending district by allowing it to withdraw from an area if it does not wish to become liable on a bond issue being considered by the receiving district." Paragraph V "protects a receiving district from becoming solely liable on an investment made in an area school established to serve pupils from both the sending district and receiving district." Thus, the State argues that the phrase "'withdrawing sending district'" should be interpreted to include both school districts that withdraw from an AREA before the AREA plan terminates, and those that choose not to extend an AREA plan and instead allow it to expire. The expiration of an AREA plan, the State contends, causes the AREA to dissolve, which, in turn, causes all of the districts to "withdraw" from what was the AREA.

V. Analysis

We agree with Dunbarton's interpretation of RSA 195-A:14. The statute sets forth two scenarios under which a sending school district may withdraw from an AREA plan.

First, if, after three years of operation, a school district votes "to undertake a study of the feasibility and suitability of a withdrawal from the area," a study committee submits a report to the Board that includes a "withdrawal plan," the Board concludes that the plan meets the statutory requirements, and the withdrawing district votes in favor of the withdrawal plan, such vote "shall be conclusive evidence of the withdrawal of the district." RSA 195-A:14, III, VII. Under this circumstance, the withdrawal plan must include "[t]he liability of the withdrawing district for its share of any outstanding indebtedness of the area," including "a rental charge, as determined by the area agreement, for the length of any outstanding bond issue." RSA 195-A:14, IV, V.

Second, if a sending district receives notice of a pending vote in the receiving district on a proposed bond issue for the construction of new facilities or additions to an AREA school, and the sending district initiates a withdrawal study in accordance with the statutory requirements before the vote in the receiving district, the sending district may withdraw if the voters in the sending district approve the withdrawal plan. See RSA 195-A:14, VI. Under this

7

circumstance, the sending district "shall not be further obligated to any bonded indebtedness as a result of such bond issue." Id.

In contrast to those two scenarios, here, the parties' AREA plan expired by its express term. Although the statute requires that AREA plans contain a term, see RSA 195-A:3, V(n), the statute does not impose any continuing obligations upon a sending district after the expiration of an AREA plan. See RSA 195-A:3, XI. Thus, the Board's determination that Dunbarton was a "withdrawing sending district" when the parties' AREA plan expired in 2014 is not supported by a plain reading of the statute. We will not consider what the legislature might have said or add language to a statute that the legislature did not see fit to include. See Strike Four, 164 N.H. at 735. The State argues that the expiration of the AREA plan caused the "dissolution" of the AREA and, thus, the "withdrawal" of all of the districts from the AREA. Assuming without deciding that "dissolution" is intended to mean the same thing as "withdrawal" under the statute, whether the Goffstown/Dunbarton/New Boston AREA dissolved is not a determination that can be made upon this record.

Our conclusion is also supported by the principle of statutory construction that "the expression of one thing in a statute implies the exclusion of another." State v. Etienne, 163 N.H. 57, 73 (2011). The force of this principle "is strengthened where a thing is provided in one part of the statute and omitted in another." 2A N. Singer & J.D. Singer, Statutes and Statutory Construction, § 47.23, at 417 (7th ed. 2007). But for the limited exception provided for sending districts in RSA 195-A:14, VI, the statute specifically provides that a sending district withdrawing from an AREA plan during the term of the plan remains obligated to pay a rental charge for the length of any outstanding bond issue. See RSA 195-A:14, V. Had the legislature intended to impose the same obligation upon the expiration of an AREA plan, it would have done so expressly.

Goffstown argues that "Dunbarton focuses on the wrong timeframe" and ignores the "key finding" of the hearing officer that "focused on the undisputed notice to Dunbarton of the Bond prior to the vote on the Bond in 2001, and Dunbarton's failure to initiate a withdrawal study prior to the vote." Given that the 1971 AREA plan did not contain a term of duration, Goffstown's argument might be persuasive had the parties not entered into a new AREA plan in 2004. The 2004 plan between the parties, however, expressly states, in a section titled "Outdated AREA Agreements," that "[o]n the effective date of this Agreement, any former AREA agreements between Goffstown, New Boston and Dunbarton shall become void." (Underlining omitted.) We agree with Dunbarton that "[u]nlike withdrawal, the statute places no limitations or conditions upon expiration, but, instead, leaves it to the parties to contract for such contingencies."

We conclude that pursuant to the plain language of the statute, Dunbarton was not a "withdrawing sending district" when the AREA plan between the parties expired in 2014, and, accordingly, we hold that the Board erred as a matter of law when it found that Dunbarton remains financially liable to Goffstown for its proportional share of the 2001 Goffstown High School construction bond.

Reversed.

HICKS, CONBOY, and BASSETT, JJ., concurred; LYNN, J., dissented.

LYNN, J., dissenting. Although I agree that the majority's construction of the pertinent provisions of RSA chapter 195-A is a reasonable one, I am not persuaded that its construction is consistent with how the legislature really intended the pertinent provisions to operate. Therefore, I respectfully dissent.

It is a fundamental principle of statutory construction that we "do not construe statutes in isolation; instead, we attempt to do so in harmony with the overall statutory scheme." Holt v. Keer, 167 N.H. 232, 241 (2015) (quotation omitted). "When interpreting two statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes." Id. (quotation omitted). We presume that the legislature would not pass an act that would lead to an absurd or illogical result. See Simpson v. Young, 153 N.H. 471, 475 (2006).

RSA 195-A:14, V imposes upon a sending school district that withdraws during the term of an AREA plan a rental charge for the length of any outstanding school construction bond undertaken by the receiving school district. See RSA 195-A:14, V (2008) (a withdrawing sending district shall remain liable for a rental charge, as determined by the AREA agreement, for the length of any outstanding bond issue); IV(c) (2008) (a withdrawal plan shall include the liability of the withdrawing district for its share of any outstanding indebtedness in accordance with paragraph V). The statute creates an exception to the requirements of paragraph V, however, by allowing a sending district, upon receiving notice from the receiving district of a pending vote on a school construction bond, to withdraw from the AREA and, thereby, avoid incurring any obligation on that bond. See RSA 195-A:14, VI (2008) ("the sending district shall not be further obligated to any bonded indebtedness" if the voters in the sending district approve the withdrawal plan).

The majority accepts Dunbarton's argument that because it terminated its relationship with the AREA plan as a result of the expiration of the plan, it is not a "withdrawing sending district" within the meaning of RSA 195-A:14, V, and thus is not liable under that section of the statute "for a rental charge . . . for the length of any outstanding bond issue." RSA 195-A:14, V. Dunbarton

9

concedes, however, that, even under this construction of the statute, it was liable to Goffstown for the "annual rental charge" specified in the AREA plan for the period of time during which the plan was in effect, that is, the period before the 2014 expiration of the agreement. See RSA 195-A:1, IX, X (2008) (defining the terms "tuition" and "annual rental charge per pupil," respectively, for purposes of RSA chapter 195-A). Thus, if Dunbarton's construction of the statute is correct, one has to assume that the legislature contemplated that, if, in response to notification from a receiving school district of its intention to incur bonded indebtedness that extends beyond the expiration of the existing AREA plan, a sending school district takes no action, i.e., does not initiate a withdrawal study pursuant to RSA 195-A:14, VI, the receiving district will be deemed to have accepted the risk that, at the expiration of the term of the plan, the receiving district will bear the entire cost of the bonded indebtedness for the period after the agreement expires. But if the legislature was willing to impose this risk upon receiving school districts, it is hard to imagine what purpose is served by imposing upon a sending district liability for the full term of the bond if the sending district withdraws before the term of the plan expires (although not in accordance with RSA 195-A:14, VI).

In short, no reason is apparent as to why the sending district's withdrawal before the expiration of the plan should extend its liability beyond the expiration of the plan. Because such a withdrawal would not expose a receiving district to any greater post-expiration risk than would result from a sending district's nonrenewal of the plan upon its expiration, there is no logical reason why the legislature would not have been content to impose liability for bonded indebtedness upon a withdrawing school district in this circumstance only for the period between the date of its withdrawal and the expiration of the term of the plan. To construe the statute in the fashion Dunbarton advocates, and the majority accepts, imposes, in effect, punitive consequences upon a sending district that withdraws — other than in compliance with RSA 195-A:14,VI — prior to the expiration of the term of the AREA plan. Although this construction of the statute does not seem to me to ring true, it is the only construction Dunbarton and the majority can place upon RSA 195-A:14, V if this statute is to be given any operative effect at all under their view of how the statutory scheme operates.

On the other hand, if — as I believe should be the case — the phrase "withdrawing sending district" is construed so as to include a sending school district that terminates its participation in the AREA plan for any reason, whether as a result of a mid-term withdrawal or the expiration of the term without renewal, then there is no need for the awkward construction of RSA 195-A:14, V produced under the majority view. Under my reading, RSA 195-A:14, V and VI operate in tandem. When a receiving district notifies a sending district of its intent to incur bonded indebtedness, the sending district has two choices: it can initiate a withdrawal study under section VI and, if it withdraws from the AREA, have no liability for such indebtedness after the

withdrawal; or it can decline to withdraw pursuant to section VI, in which case it will remain liable for its share of any outstanding indebtedness for the length of the bond issue pursuant to section V. This construction does not seem to me to be unfair to sending school districts, as Dunbarton argues, since a sending district that receives notice of a proposed bond issue by a receiving district that contains a term extending beyond the expiration of the current AREA plan can insist, as a condition of not exercising its withdrawal rights, that the terms of the plan be extended to cover the length of the bond.

I acknowledge that the construction of the statute I advocate, which treats the expiration of a plan as a "withdrawal" under RSA 195-A:14, V, places a different meaning on the term "withdrawal" than it is given under other subsections of RSA 195-A:14 (2008) (no party asserts, for example, that before a plan can expire at the end of its term a "withdrawal" feasibility study must be conducted under RSA 195-A:14, III), and that this is arguably at odds with one of our rules of statutory construction. See Appeal of Denton, 147 N.H. 259, 260 (2001) ("Words used with plain meaning in one part of a statute are to be given the same meaning in other parts of the statute, unless a contrary intention is clearly shown." (quotation omitted)). However such rules are intended as interpretative guideposts only, which must give way in the face of other indicia, as exists here, that such rules do not produce a logical outcome. See Ruel v. N.H. Real Estate Appraiser Bd., 163 N.H. 34, 39 (2011) (stating that the court will not interpret statutory language in a literal manner when such a reading would lead to an absurd or illogical result). Moreover, because, regardless of whether the reason is mid-term discontinuance or discontinuance at the end of the term, a sending school district that stops educating its children at the receiving district's schools can logically be understood to have "withdrawn" from those schools, it is readily understandable that the legislature would use that term in a generic sense in RSA 195-A:14, V to capture both situations. See Webster's Third New International Dictionary 2626 (unabridged ed. 2002) (defining "withdrawal" as "the act of drawing someone or something back from or out of a place or position").

For the reasons stated above, I respectfully dissent. I also add one final point, as to which I feel confident both the majority and I agree: because the statutory provisions at issue are susceptible to two plausible but conflicting interpretations, the legislature should clarify their meaning so as to avoid uncertainty in this important area of law.